[No. B192342. Second Dist., Div. Three. Apr. 21, 2008.]

SC MANUFACTURED HOMES, INC., et al., Plaintiffs and Appellants, v. NORMAN SCOTT LIEBERT et al., Defendants and Respondents.

COUNSEL

Law Offices of William R. Ramsey and William R. Ramsey for Plaintiffs and Appellants.

Law Office of Anthony C. Rodriguez and Anthony C. Rodriguez for Defendants and Respondents Norman Scott Liebert, Pacific Mobile III, L.P., Seals III, LLC, and the Liebert Corporation.

Klinedinst, G. Dale Britton, John D. Klinedinst, Gregor A. Hensrude; Miller, Canfield, Paddock & Stone, Frederick R. Juckniess and Gregory L. Curtner for Defendants and Respondents San Jose Advantage Homes, Inc., and Glenn Gilliam.

Law Offices of Samuel M. Huestis and Samuel M. Huestis for Defendants and Respondents Hermitage Mobile Homes Sales, Inc., and Joseph DeBoard.

McGarrigle, Kenney & Zampiello, Patrick C. McGarrigle and Philip A. Zampiello for Defendants and Respondents L.C. Manufactured Housing, Inc., and Neil Landes.

Laughlin, Falbo, Levy & Moresi and Peter C. Flanderka for Defendants and Respondents Macy Homes, Inc., Robert E. Durant and David Durant.

Eric B. Kaminsky for Defendants and Respondents Maple Ridge Mobile Homes/CA, Inc. and Sam Silverman.

OPINION

**ALDRICH, J.—**

I.

INTRODUCTION

This appeal involves allegations that a mobilehome park and a number of mobilehome dealers were involved in an illegal tying arrangement per se whereby prospective park tenants were forced to buy a mobilehome from one of the dealers in order to secure a space in the park. We hold that plaintiff has not stated causes of action for violating the Cartwright Act, the unfair competition law, or interference with prospective economic advantage. Thus,

we affirm the judgment of dismissal entered after the trial court sustained two demurrers without leave to amend.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The initial pleadings and proceedings.*

Plaintiff and appellant SC Manufactured Homes, Inc. (SC Homes), is a retail dealership of mobilehomes in Los Angeles County. Plaintiff and appellant Charles W. Redick, a licensed mobilehome dealer, owns SC Homes jointly with his wife. Redick is also the general manager of SC Homes and is a licensed mobilehome salesman. (We refer to SC Homes and Redick collectively as plaintiff.)

Plaintiff sued a large number of mobilehome dealers, mobilehome park managers, and mobilehome park owners. The substance of the original complaint was that defendants were involved in a conspiracy by which mobilehome dealers paid kickbacks to park owners and operators for the exclusive right and privilege of marketing and selling their mobilehomes in the parks, thereby restraining trade, preventing competition, increasing the cost of the mobilehomes in those parks, and interfering with plaintiff's contracts and potential contracts. Allegedly, the conspiratorial conduct denied plaintiff the ability to sell and lease mobilehomes in the Santa Clarita Valley.

As part of this conspiracy, plaintiff alleged he was denied the ability to model mobilehomes in the parks. This allegation arises because, as the parties agree, the term "mobilehome" can viewed as a misnomer. Once mobilehomes are in a park, they are difficult to relocate. When park tenants leave a park, either willingly or for other reasons such as eviction, they usually do not take their mobilehomes with them. (See *People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 109 [3 Cal.Rptr.3d 429]; *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc.* (2007) 148 Cal.App.4th 663, 673 [56 Cal.Rptr.3d 79].) In such situations, mobilehome dealers may make arrangements to buy and pull out the old mobilehome and replace it with another, hoping the new tenant will purchase the "modeled home" (or "pullout").

The original complaint was filed on March 5, 2004. It named more than 70 defendants, including the owners and managers of 13 mobilehome parks, numerous mobilehome dealers, and one attorney. Thereafter, plaintiff filed a first amended complaint.

The attorney defendant was accused, among other allegations, of illegally evicting tenants. He filed an anti-SLAPP (strategic lawsuit against public participation) motion (Code Civ. Proc., § 425.16), which was granted by the trial court. In an unpublished opinion, *SC Manufactured Homes, Inc. v. Trevillyan* (Apr. 26, 2006, B180299), we reversed.

Plaintiff dismissed 33 defendants, representing 12 of the 13 mobilehome parks, and many dealers, park owners, and park managers. The dismissed defendants then sought attorney fees and costs pursuant to the Mobilehome Residency Law (Civ. Code, § 798 et seq.; the MRL). In *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc., supra*, 148 Cal.App.4th 663, we held that the trial court correctly denied the attorney fee and costs request because the case did not arise under the MRL.[1]

2. *The pertinent complaint.*

a. *The parties.*

On December 3, 2004, plaintiff filed his second amended complaint. In the second amended complaint, only 17 defendants remained. These defendants represented six mobilehome dealers and only one park, defendant and respondent Parklane Mobile Estates. All but two of the 17 defendants appear on appeal as respondents.

The four defendants and respondents associated with Parklane Mobile Estates are referred to collectively as Parklane. They are Norman Scott Liebert, Pacific Mobile III, L.P., Seals III, LLC, and the Liebert Corporation.[2]

The defendant dealers are (1) San Jose Advantage Homes, Inc., and its owner, president, and managing agent Glenn Gilliam; (2) Hermitage Mobile Home Sales, Inc., and its owner and president Joseph DeBoard; (3) L.C. Manufactured Housing, Inc., and its owner and president Neil Landes; (4) Macy Homes, Inc., its owner and president Robert E. Durant, and its general manager David Durant; (5) Maple Ridge Mobile Homes/CA, Inc., and its owner and president Sam Silverman; and (6) Stanley Affordable Homes, Inc., and its owner and president Stanley Wactler.[3]

---

[1] The MRL "regulates relations between the owners and the residents of mobilehome parks." (*Cacho v. Boudreau* (2007) 40 Cal.4th 341, 345 [53 Cal.Rptr.3d 43, 149 P.3d 473]; see also *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc., supra*, 148 Cal.App.4th at p. 673.)

[2] Three of the dismissed defendants also were associated with Parklane. They are not parties to the present appeal.

[3] Defendants Stanley Affordable Homes, Inc., and Stanley Wactler have not appeared on appeal. All other defendant dealers appear on appeal as respondents.

b. *The substantive allegations.*

The second amended complaint is the pertinent pleading. It alleges three causes of action: (1) violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.); (2) intentional interference with prospective economic advantage; and (3) violation of the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.).

(1) *The conspiracy allegations.*

At the beginning of the second amended complaint, plaintiff summarized his allegations as follows: "This action is brought by . . . a [mobilehome] dealer, against the owners and operators of [certain mobilehome parks] located in the City of Santa Clarita, . . . who conspired with certain mobilehome dealers . . . to restrain trade and increase profits by refusing to allow buyers of new homes to locate in the park unless they bought particular homes from the [defendant dealers] who provided kickbacks of $30,000 or more to the [defendant park operators] for the exclusive right to place and sell their homes on spaces within the park. These kickback arrangements have sometimes been confirmed in writing, thinly disguised as various business ventures. See, e.g. Exhibit 1, a [February 11, 2003,] letter to [plaintiff] from [Parklane's attorney] describing how only dealers who enter into a so-called 'joint venture' arrangement with [Parklane] to pay [it] $30,000 per space will be allowed to sell homes on those spaces. . . . [¶] 8. These schemes . . . prevent open and fair competition among [mobilehome] dealers, unduly increase the price of mobilehomes, and deprive mobilehome buyers of their freedom of choice regarding which home they may buy and choice of dealer from which they may purchase that home. [¶] 9. [Plaintiff] is a [mobilehome dealer] who refused to pay kickbacks . . . and was thus damaged in having been foreclosed from competing equally in the marketplace of new mobilehomes because his customers were denied tenancy in the park of their choice if they purchased from him, and the sale of mobilehome is not possible without the availability of a desirable space upon which to locate that home. [It is illegal to charge tenants entry fees in order to obtain a lease.] It is also illegal for a park owner or operator to demand a fee or commission for the sale of a mobilehome, either directly from the buyer (or seller), or indirectly from the mobilehome dealer, unless the fee is disclosed and approved in advance and the park operator performs actual sales services commensurate with the fee."

Plaintiff also alleged that the conspiracy resulted in "closed parks," i.e., parks that " 'reserve[]' all (or virtually all) of the available spaces in the park to one or more specific dealers for the placement of new model homes until

they are sold, leaving none for a potential tenant to lease and place on it a new [mobilehome] purchased from a dealer of his own choice."

Plaintiff further alleged that the conspiratorial acts of connecting the lease of a mobilehome park space to the sale of certain mobilehomes was an illegal tying arrangement per se. Plaintiff alleged that "[t]he act of tying the purchase of one product (*e.g.* the rental of a mobilehome space) to the purchase of another product (*e.g.* a mobilehome) [was] considered illegal per se . . . ." Plaintiff alleged that the "arrangements between the [defendants] were created for the purpose and objective of preventing competition and restricting trade or commerce in the selling of mobilehomes in the Santa Clarita Valley market as a whole and in their own [mobilehome] parks, each [of] which represents its own separate and distinct market."

Plaintiff also alleged he was illegally refused opportunities to "model" and sell mobilehomes. Thus, for example, plaintiff alleged that after he purchased a mobilehome from a tenant residing on space No. 355 in Parklane, he was precluded from pulling that mobilehome out of the park and replacing it with a new mobilehome to be displayed for sale.

(2) *Allegations regarding the market for mobilehomes and Parklane.*

Other allegations in the complaint described the market for mobilehomes in the Santa Clarita Valley in the 1990's as follows: In November 1990, the City of Santa Clarita Valley issued an ordinance declaring that "[t]here is presently within the City of Santa Clarita a shortage of space for the location of manufactured homes. Because of this shortage there is a low vacancy rate [and] a virtual monopoly exists in the rental of manufactured home park spaces, creating a situation where Park Owners have potentially unbridled discretion and ability to exploit manufactured home Park Residents." However, a few years later, because of the 1994 Northridge earthquake, which destroyed many mobilehomes, and an economic recession, which resulted in numerous foreclosures, there were dozens of vacant spaces in many of the larger Santa Clarita Valley mobilehome parks and the market for mobilehomes in the Santa Clarita Valley was virtually not existent.

Plaintiff identified nine nonparty mobilehome parks in the Santa Clarita Valley that were "closed" and 19 nonparty "open" parks in five cities in the Santa Clarita Valley.

Plaintiff alleged that the nonparty closed parks and Parklane, "are the best established and most desirable [mobilehome] park locations in their respective markets."

As to Parklane, plaintiff alleged the following: "Parklane was located in the City of Santa Clarita. Parklane had 406 spaces, referred to as the 'old section' of the park. Mobilehome buyers desire large parks because those parks, such as [Parklane], have the most amenities (*e.g.* clubhouses and swimming pools) and provide a better sense of security in a larger community setting. [Parklane] is the second largest park in the Santa Clarita Valley." "[Parklane] enjoys a superior location in the center of town not far from City Hall, close to shopping and employment opportunities."

By the end of 1996, new mobilehome sales in Parklane had come to a virtual standstill, with only seven new mobilehomes being sold from 1994 through 1996. By February 1997, Parklane had 50 vacant spaces and an additional 21 spaces containing mobilehomes owned by Parklane.

In February 1997, plaintiff was allowed to model mobilehomes in Parklane. In 1997, approximately 40 new mobilehomes were sold at Parklane, including 22 sold by plaintiff. The sale prices of the 40 mobilehomes averaged $57,087, with a high of $79,287. At this time, the "recession began to subside and shortly thereafter there was again a shortage of spaces" in the Santa Clarita Valley. Parklane was turned into a closed park in mid-1998.

Beginning in June of 1998, plaintiff declined Parklane's offer to pay rent for spaces while plaintiff placed mobilehomes in the park hoping the mobilehomes thereafter would be sold. Plaintiff also declined Parklane's invitation to buy some of the abandoned mobilehomes owned by Parklane "in return for being able to continue to sell new homes [to Parklane]."

Twice (once in Dec. 1999 and once in Apr. 2001) Parklane employees informed plaintiff he could pull out old mobilehomes and replace them with new ones to model. Because of these promises, plaintiff was permitted to sell the two mobilehomes from Parklane. These were the last mobilehomes plaintiff sold at Parklane after the park became "closed" in 1998. From September 2001 through January 2003, Parklane refused to permit plaintiff to model mobilehomes from the park.

Plaintiff attached to his complaint, as exhibit 2, a September 12, 2001, letter from Parklane's counsel to plaintiff. In this letter, Parklane informed plaintiff that because plaintiff had been dishonest, made disparaging remarks

about the park, and refused to sign an arbitration agreement, he would not be permitted to place a mobilehome in the park for purposes of selling the mobilehome, i.e., plaintiff would not be able to model in the park. However, plaintiff was free to sell a mobilehome to a tenant or a prospective tenant.[4]

Plaintiff also alleged that after plaintiff refused to pay rent to place a mobilehome in Parklane to model, Parklane made such an arrangement with mobilehome dealer Mobile Mansions, and then with dealer defendants. Between 1998 and 2001, "non-party actor" Mobile Mansions sold 27 new mobilehomes at Parklane. During those four years, defendant and respondent L.C. Manufactured Housing, Inc., sold 50 new mobilehomes at Parklane. Defendant and respondent Maple Ridge Mobile Homes/CA, Inc., and defendant and respondent Macy Homes, Inc., each sold one mobilehome in 2001. In 2003, defendant and respondent San Jose Advantage Homes, Inc., sold 20 mobilehomes and defendant and respondent Hermitage Mobile Homes Sales, Inc., sold one. Parklane permitted these sales because these dealers paid kickbacks ranging from $5,000 to $10,000. Plaintiff further alleged that "[As of December 2004, Parklane was] the largest mobilehome park in the Santa Clarita Valley with available spaces . . . ."

Plaintiff also alleged facts with regard to Parklane's "new section," as follows: In March 1998, Parklane received permission from the planning commission to add 29 additional mobilehome lots adjacent to the existing park, giving Parklane a total of 435 spaces. "The [new section] of [Parklane] was and is a highly desirable location for potential new [mobilehome] sales,

---

[4] In the September 12, 2001, letter (exhibit 2) to plaintiff, Parklane stated that "[u]nder California law one company may refuse to do business with another company. . . . [¶] . . . [¶] [Parklane] has conducted business with many mobilehome dealers in your area . . . [with which Parklane] has . . . had professional and cordial relationships . . . . [¶] By contrast, your company has been extremely difficult for [Parklane] to conduct business with. For example, you have made false statements regarding [Parklane's owner and operator] and you have made derogatory comments to tenants about the park itself. In addition, you have refused to sign an arbitration agreement regarding disputes that may arise involving your company, although many other dealers have signed similar agreements. As a result of all of the above, [Parklane] has no interest in conducting business with you or your company. [¶] I want to make clear that [Parklane] has _no_ objection to you representing any tenant or prospective tenant with respect to the sale or purchase of any new or used mobilehome at the park. However, [Parklane] does have an objection to doing business with you and your firm and therefore has decided it can no longer rent space to you or your company to sell your mobilehomes from [the park]. [¶] In conclusion, although you are free to conduct business with tenants and prospective tenants with respect to their mobilehomes at Parklane, you and your company will no longer be able to rent space at the park for the purpose of selling your mobilehomes." (Original underscoring & italics.)

both because of its upscale development and because of the dearth of available spaces elsewhere in the Santa Clarita Valley."

By February 2003, Parklane had not begun construction on the 29 new spaces. Instead of developing the 29 new spaces itself, Parklane made each space available for joint development by dealers that could place a mobilehome for sale on the space after paying for its development.[5] From 2002 to 2003, Parklane attempted to convince numerous dealers to contribute $30,000 to $50,000, per space, to develop the new spaces. Each of the dealers declined "solely because they could not afford" the costs.

In February 2003, plaintiff tried to reserve a space in the new section of the park, even though the spaces had not been developed. In exhibit 1, a letter dated February 11, 2003, to plaintiff, Parklane's counsel explained that Parklane had obtained approval for the 29 spaces in the new section of the park, but had determined it was not economically feasible to develop these spaces, unless others assisted. Parklane's counsel also stated in the letter the following: Parklane was willing to deal directly with persons who wished to lease any of the new spaces and place a new mobilehome on that space, provided the prospective tenant hired a contractor to develop the space. Parklane expected the development costs would be approximately $30,000, plus the cost of other expenditures, such as permit fees and utility systems. Parklane would work with any developer, other than plaintiff. Parklane believed that plaintiff had made misrepresentations to a prospective tenant and those misrepresentations reinforced Parklane's position that it would be a mistake to do business directly with plaintiff. However, once a pad was developed by a prospective tenant, plaintiff was free to sell a mobilehome to any person wishing to live there.[6]

---

[5] "A [mobilehome] owner typically rents a plot of land, called a 'pad,' from the owner of a [mobilehome] park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The [mobilehome] owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping." (*Yee v. Escondido* (1992) 503 U.S. 519, 523 [118 L.Ed.2d 153, 112 S.Ct. 1522].)

[6] The February 11, 2003, letter (exhibit 1) read in part: "[In your recent letter] you indicate that you have sold a new mobilehome for installation . . . at space No. 19 in the proposed new section at the park[to a prospective tenant]. [¶] [Parklane has] had no discussions with you . . . regarding the development of that space, or any other space in the proposed new section . . . . [¶] [Thus, Parklane] can only conclude that you have either misrepresented the facts to [the prospective tenant] or are otherwise engaging in unfair and deceptive business practices. Because it is uncertain . . . when or if space No. 19 will be developed, you are respectfully requested to cease making false representations to third parties regarding that space. . . . [¶] [Parklane has] begun development of the *common areas* [of] those 29 new mobilehome spaces at the park . . . . However, [Parklane has] decided it does not make economic sense to proceed with the development of the actual spaces unless and until [it obtains] contributions from one or more joint venturers, to offset part of the development costs. [Parklane expects] the financial

Plaintiff alleged that the February 11, 2003, letter was a "thinly disguised" kickback arrangement that violated Civil Code section 798.37 (which limits fees park owners may charge homeowners).

In 2003, defendant San Jose Advantage Homes, Inc., developed all 29 spaces in the new park, thereby receiving the exclusive rights to model and sell mobilehomes for the spaces in that section of the park pursuant to the joint venture agreement similar to the one described in exhibit 1. San Jose Advantage Homes, Inc., was "able to charge as much as $50,000 more to place a [mobilehome] in the New Section of [Parklane] as it charged to place a virtually identical home next door in the Old Section of the same park . . . ."

Plaintiff attached to its second amended complaint exhibits 3 and 7 in which plaintiff allegedly demonstrated that from 1997 through 2004, 74 percent of the 548 mobilehomes that were sold in the Santa Clarita Valley were closed to plaintiff because he "would not pay bribes and kickbacks to [defendant park operators]." Exhibits 4 through 9 allegedly demonstrated that in those seven years, plaintiff sold 42 percent of the mobilehomes in those parks that were *not* part of the conspiracy, but only 3 percent in those parks that were part of the conspiracy. Of the 548 sales made from 1997 to 2004, 140 mobilehomes were sold to Parklane residents. Of those mobilehomes sold to Parklane residents, 89 were sold by defendant dealers and 41 were

---

contributions from such joint venturers to be approximately $30,000 per space, plus the cost of certain permits, fees, utility systems and improvements. [¶] [Presently,] no development agreement has been entered into with respect to even one of the proposed new spaces at the park. [Also, Parklane has not established minimum construction standards or projected the rent to be charged for the new spaces.] [¶] It is hard to imagine that [the prospective tenant] would have committed to buying a new mobilehome at space No. 19 . . . without knowing . . . whether that space will be . . . developed[,] when and if she will be able to take possession[,] what the minimum construction standards will be and[,] how much rent she will have to pay. Accordingly, [Parklane has] concluded that you have either misrepresented the facts to [the prospective tenant], or you are simply trying to 'set up' [Parklane] for litigation. [¶] . . . [I]n my letter of September 12, 2001, . . . I advised you . . . [that Parklane has] no interest in doing business with you . . . . The misrepresentations you apparently have made to [the prospective tenant] only reinforces [Parklane's] belief that it would be a mistake to do business with . . . you. . . . [¶] . . . Because no development agreements have been entered into as of this date, [the prospective tenant] is welcome to retain a contractor (other than you) to enter into a development agreement for space No. 19, pursuant to the **same** terms and conditions that [Parklane intends] to offer to all other potential developers. If [the prospective tenant] is willing to develop the space and contribute to the costs of construction, she would then presumably be in a position to place a new mobilehome on that space . . . . [A]lthough [Parklane] will not enter into a development agreement with you, if [the prospective tenant develops the property] [Parklane] would not object to her or her contractor purchasing the mobilehome for that space from you . . . ." (Original boldface, underscoring & italics.)

sold by Mobile Mansions. By the end of 2004, the average price of new mobilehomes in open parks was $68,542 and in Parklane was $144,687.

Of the 150 mobilehomes sold to Parklane residents, sales of 109 mobilehomes, accounting for 81 percent of the sales revenues, were attributed to the alleged conspiratorial acts. The sale prices of those 150 sales averaged $57,087 in 1997 and rose to $144,687 in 2004.

Plaintiff alleged that the illegal acts of defendants, including the tying arrangements and kickbacks, violated the MRL and Health and Safety Code section 18035.3.[7]

The first cause of action for violation of restraint of trade under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) alleged the kickback conspiracy was an illegal tying arrangement per se, prevented competition, and restricted commerce by coercing prospective homeowners in the Santa Clarita Valley to buy new mobilehomes only from those dealers who paid kickbacks.

The second cause of action for intentional interference with prospective economic advantage alleged that because plaintiff would not pay kickbacks, the conspirators intentionally interfered with plaintiff's relationship with mobilehome buyers, mobilehome sellers, and park operators.

In the third cause of action for violating the UCL (Bus. & Prof. Code, § 17200 et seq.), plaintiff alleged the following: the conspiracy enabled defendants to compete unfairly against those who would not participate in the kickback scheme. Defendant dealers received extra profits through inflated mobilehome prices and recouped illegal kickback charges by secretly increasing the amount homeowners paid for mobilehomes. New homeowners were unaware that the amount paid for a mobilehome included " 'fees or services' that are not disclosed . . . as required by [Health and Safety Code section] 18035.3." Plaintiff, who refused to participate in the conspiracy, lost the opportunity to make profits from the sales of mobilehomes. The fees Parklane charged dealers to lease spaces was "tantamount to an advance sales commission [and] violates [the MRL] . . . ."

3. *The current proceedings.*

Defendants concurrently filed two demurrers to the second amended complaint.

---

[7] Health and Safety Code section 18035.3 mandates certain disclosures by dealers of mobilehomes when selling mobilehomes.

Parklane asked the trial court to take judicial notice of records from the California Department of Housing and Community Development and from the United States Census Bureau profile for the year 2000. These showed the following: (1) there were five cities in Santa Clarita Valley containing 32 mobilehome parks with a total of 3,538 mobilehome spaces; (2) there were 2,566 mobilehome spaces located in the City of Santa Clarita; (3) there were 53,475 mobilehomes and a total of 3,270,909 housing units in Los Angeles County; and (4) of the total number of housing units, less than 300,000 were valued at less than $150,000.

In opposing the demurrers, plaintiff withdrew his allegations based upon Parklane's refusal to model mobilehomes in the park. Plaintiff also abandoned any claim that he had standing to sue under the MRL and on appeal has not made any arguments based upon violations of Health and Safety Code section 18035.3.

On June 1, 2006, the trial court filed an opinion and order regarding demurrers to the second amended complaint sustaining the demurrers without leave to amend.

Plaintiff appeals from the subsequently entered judgment of dismissal. We affirm the judgment.

### III.

### DISCUSSION

1. *Standard of review and initial discussion.*

"We independently review the ruling on a demurrer and determine de novo whether the pleading alleges facts sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and facts of which judicial notice can be taken. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) We construe the pleading in a reasonable manner and read the allegations in context. (*Ibid.*)" (*Zenith Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998, 1006 [55 Cal.Rptr.3d 911]; see also *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1305 [35 Cal.Rptr.3d 453].)[8]

---

[8] It does not appear that the trial court ruled on Parklane's request for judicial notice. However, we examine the pleadings de novo. The documents submitted are official records of which we may take judicial notice (Evid. Code, § 452, subds. (c), (g), (h); *Rodas v. Spiegel*

If the allegations in the complaint conflict with the exhibits, we rely on and accept as true the contents of the exhibits. However, in doing so, if the exhibits are ambiguous and can be construed in the manner suggested by plaintiff, then we must accept the construction offered by plaintiff. (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447 [104 Cal.Rptr.2d 239]; *Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 505 [108 Cal.Rptr.2d 657]; *Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1627 [272 Cal.Rptr. 623]; see also *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 [282 Cal.Rptr. 233]; *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 128 [226 Cal.Rptr. 321].)

The premise of plaintiff's complaint is that he was foreclosed from selling mobilehomes to tenants who wished to live in Parklane. As stated above, plaintiff has abandoned his allegations that he was denied the ability to model mobilehomes in Parklane, has abandoned his allegations based upon the MRL and the Health and Safety Code, and has dismissed all mobilehome parks from the lawsuit other than Parklane. On appeal, plaintiff summarizes his plea as follows: "[Plaintiff] merely wants to sell his mobilehomes to customers from his own dealership lot and order them for delivery from the factory, just like any new car agency, and let the prospective buyer/tenants separately and freely choose where they want to live."

To the extent plaintiff alleges he was foreclosed from selling directly to homeowners, exhibits 1 and 2 undermine the viability of this allegation. (See fns. 4, 6.) In these letters, Parklane informed plaintiff that it would not deal directly with him, but that any tenant wishing to purchase a mobilehome from plaintiff was free to do so. As such, Parklane acted legally and did not deny plaintiff the ability to sell or place mobilehomes in the park.

■ The law is well settled that absent a violation of public policy or statute, Parklane may choose to do business with whomever it wishes. Parklane's refusal to deal directly with SC Homes becomes illegal only if Parklane's actions were forbidden by antitrust law, were part of an illegal conspiracy, or produced an unreasonable restraint of trade. (*People's Choice Wireless, Inc. v. Verizon Wireless* (2005) 131 Cal.App.4th 656, 663–664 [31

---

(2001) 87 Cal.App.4th 513, 518 [104 Cal.Rptr.2d 439] [records, reports, and orders of administrative agencies are "official acts" of which court may take judicial notice]; *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 666, fn. 1 [51 Cal.Rptr.3d 821] [judicial notice of facts in census]; *Moehring v. Thomas* (2005) 126 Cal.App.4th 1515, 1523, fn. 4 [25 Cal.Rptr.3d 118] [same].)

Cal.Rptr.3d 819], citing *United States v. Colgate & Co.* (1919) 250 U.S. 300, 307 [63 L.Ed. 992, 39 S.Ct. 465] and *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* (2004) 540 U.S. 398, 407–408 [157 L.Ed.2d 823, 124 S.Ct. 872]; see generally *Roth v. Rhodes* (1994) 25 Cal.App.4th 530 [30 Cal.Rptr.2d 706].)

Thus, we turn to plaintiff's conspiracy, antitrust, and restraint of trade allegations.

### 2. *Plaintiff cannot state a cause of action under the Cartwright Act.*

Plaintiff's first cause of action was for violation of the Cartwright Act. Plaintiff alleged the acts of defendants constituted an illegal tying arrangement per se. Plaintiff alleged there was a conspiracy that forced tenants wishing to lease space in Parklane to buy mobilehomes from defendant dealers.

#### a. *The Cartwright Act.*

■ "The Cartwright Act, Business and Professions Code section 16700 et seq., prohibits conspiracies that unreasonably restrain trade. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* [2004] 114 Cal.App.4th [309,] 334 [7 Cal.Rptr.3d 628]; *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 369 [113 Cal.Rptr.2d 175].)" (*SC Manufactured Homes, Inc. v. Canyon View Estates, Inc., supra,* 148 Cal.App.4th at p. 672, fn. 6.) Thus, the Cartwright Act is similar to the Sherman Act (15 U.S.C. § 1 et seq.), which is also designed to prohibit restraints of trade. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* at p. 334.)

"Section 16720 [of the Cartwright Act] defines a trust as 'a combination of capital, skill or acts by two or more persons' for the purpose of restraining trade. Except as expressly provided in the Cartwright Act, 'every trust is unlawful, against public policy and void.' (Bus. & Prof. Code, § 16726.) Federal law interpreting Sherman Antitrust Act section 1 (15 U.S.C. § 1) is useful when addressing issues arising under section 16720. (*State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1164 [252 Cal.Rptr. 221, 762 P.2d 385], superseded by statute on other grounds as stated in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1420–1421 [267 Cal.Rptr. 819].)" (*Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 541 [78 Cal.Rptr.2d 133].)[9]

---

[9] "Many cases state that [Business and Professions Code] section 16720 was patterned after section 1 of the Sherman Act [15 U.S.C. § 1] and that federal law construing section 1 is applicable to resolve problems arising under section 16720. [Citations.]" (*Morrison v. Viacom,*

b. *Tying arrangements.*

■ "Both the Sherman Act and the Cartwright Act (Bus. & Prof. Code, § 16720 . . .) prohibit tying arrangements that operate as unreasonable restraints on trade." (*Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1234 [60 Cal.Rptr.3d 631].)

"A tying arrangement is 'a requirement that a buyer purchase one product or service as a condition of the purchase of another. [Citation.] Traditionally the product which is the inducement for the arrangement is called the "tying product" and the product or service that the buyer is required to purchase is the "tied product." ' [Citation.]" (*Morrison v. Viacom, Inc., supra,* 66 Cal.App.4th at pp. 540–541; accord, *Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* 114 Cal.App.4th at p. 339.) Linking the sale of one product to another is not always illegal. Rather, the modern approach focuses on whether the seller has sufficient economic power with respect to the tying product and market to restrain competition in the tied product market. (*Illinois Tool Works Inc. v. Independent Ink, Inc.* (2006) 547 U.S. 28, 34–38 [164 L.Ed.2d 26, 126 S.Ct. 1281].)

A tying arrangement is illegal only if customers are forced to buy the tied product as a result of the seller's exploitation of its control over the tying product, resulting in anticompetitive consequences. Otherwise, the buyer can simply walk away and turn to another seller. (*Jefferson Parish Hospital Dist. No. 2 v. Hyde* (1984) 466 U.S. 2, 12, 14, 25, 27 [80 L.Ed.2d 2, 104 S.Ct. 1551]; *Northern Pac. R. Co. v. United States* (1958) 356 U.S. 1, 6–7 [2 L.Ed.2d 545, 78 S.Ct. 514].)

■ "Antitrust laws against tying arrangements seek to eradicate the evils that (1) competitors are denied free access to the market for the tied product

*Inc., supra,* 66 Cal.App.4th at p. 541, fn. 2.) This is because section 1 of the Sherman Act (15 U.S.C. § 1) and section 16720 of the Cartwright Act (Bus. & Prof. Code, § 16720) cover similar areas and both are designed to foster competition. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* 114 Cal.App.4th at p. 334.) However, in *State of California ex rel. Van de Kamp v. Texaco, Inc., supra,* 46 Cal.3d 1147, the Supreme Court concluded that unlike its federal counterpart, the Cartwright Act did not apply to mergers. In reaching this conclusion, the Supreme Court "stated that 'the Sherman Act is not, contrary to our past statements, directly probative on interpretation of the Cartwright Act.' Though not always directly probative of the Cartwright Act drafters' intent, judicial interpretations of the Sherman Act are, nevertheless, often helpful because of the similarity in language and purpose between the federal and state statutes. [Citations.]" (*Morrison v. Viacom, Inc., supra,* at p. 541, fn. 2, quoting *Van de Kamp,* at p. 1168; see also *Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 183, fn. 9 [91 Cal.Rptr.2d 534].)

not because the seller imposing the tying requirement has a better or less expensive tied product, but because of the seller's power or leverage in the market for the tying product; and (2) buyers are forced to forgo their free choice between competing tied products. [Citation.]" (*Freeman v. San Diego Assn. of Realtors, supra*, 77 Cal.App.4th at p. 184.)

Tying arrangements usually involve circumstances where the purchaser must buy the tying and tied product from the same seller. However, an illegal tying arrangement may exist where the purchaser is required to buy the tied product from a third party. In such situations, the third party is designated by the seller. (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 547 [161 Cal.Rptr. 811] (*Suburban*); *Sports Racing Serv. v. Sports Car Club of Amer.* (10th Cir. 1997) 131 F.3d 874, 887; *Abraham v. Intermountain Health Care, Inc.* (10th Cir. 2006) 461 F.3d 1249, 1265.)

■ " 'California and federal antitrust law under the two acts generally distinguish between conduct that is per se unlawful and conduct that is evaluated under the rule of reason. The law conclusively presumes manifestly anticompetitive restraints of trade to be unreasonable and unlawful, and evaluates other restraints under the rule of reason. [Citations.]' [Citation.]" (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra*, 114 Cal.App.4th at pp. 334–335; see *Morrison v. Viacom, Inc., supra*, 66 Cal.App.4th at p. 540.)

■ Plaintiff alleged the conspiratorial agreement among defendants constituted an illegal tying arrangement per se pursuant to Business and Professions Code section 16720.[10] "The elements of a per se tying arrangement violative of section 16720 are: '(1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; (3) a substantial amount of sale was affected in the tied product; and (4) the complaining party sustained pecuniary loss as a consequence of the unlawful act. [Citations.]' [Citations.]" (*Morrison v. Viacom, Inc., supra*, 66 Cal.App.4th at pp. 541–542; accord, *RLH Industries, Inc. v. SBC Communications, Inc.* (2005) 133 Cal.App.4th 1277, 1283 [35 Cal.Rptr.3d 469].)[11]

---

[10] Thus, plaintiff is foreclosed from arguing on appeal that the allegations in his complaint constitute an illegal tying arrangement based upon the rule of reason.

[11] Business and Professions Code section 16720 reads in part: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: [¶] (a) To create or carry out restrictions in trade or commerce."

Business and Professions Code section 16726 declares that "every trust is unlawful, against public policy and void."

c. *Plaintiff did not state a cause of action for an illegal tying arrangement per se.*

As a first requirement of an illegal tying arrangement per se, there must be a tie, i.e., in order for the purchaser to buy the tying product, the customer is required to purchase the tied product. Here, plaintiff alleged that in order for tenants to rent space in Parklane (the tying item) customers were required to purchase mobilehomes (the tied item) from specific dealers. However, the allegations in plaintiff's complaint, concessions by plaintiff's counsel, and attachments to the complaint show that plaintiff cannot state a cause of action based upon an illegal tying arrangement per se.

Plaintiff's counsel admitted that this lawsuit did not address whether any prospective tenant could buy a mobilehome from an existing tenant and replace that mobilehome with a new one, from any dealership.

Further, Parklane did not preclude plaintiff from selling mobilehomes to prospective tenants who intended to place a mobilehome on a vacant space in the old section of the park. Rather, Parklane only precluded plaintiff from entering into a direct business relationship with Parklane. Parklane refused to rent space to plaintiff. In its September 12, 2001, letter (exhibit No. 2, fn. 4), which was incorporated into plaintiff's complaint and relied upon by him, Parklane informed plaintiff that he was free to sell homes to anyone wishing to place a mobilehome in Parklane, but that Parklane had "no interest in conducting business with [plaintiff]." In this letter Parklane informed plaintiff that "you are free to conduct business with tenants and prospective tenants with respect to their mobilehomes at Parklane[but Parklane will not deal directly with] you and you and your company will no longer be able to rent space at the park . . . ."[12]

Thus, we turn to the spaces in the new section of Parklane. Here, plaintiff alleges the "development" charges were a coverup for an illegal tying arrangement per se whereby defendant dealers and other dealers paid Parklane for the privilege of selling mobilehomes from Parklane. As to these allegations, plaintiff has not stated a cause of action because homeowners were not forced to buy a mobilehome from any particular dealer.

---

[12] Plaintiff identified only four vacant spaces that did not require dealer pullouts. These purportedly were reserved to defendant Macy Homes, Inc., which placed mobilehomes on three of the lots to model. However, plaintiff refused to pay rent for the time his mobilehomes would be placed on Parklane spaces, has abandoned his plea to model mobilehomes, and Parklane was not obligated to allow plaintiff to place his mobilehomes in the park without paying rent.

Exhibit 1 demonstrated that as of February 11, 2003 (the date of the letter), Parklane had not entered into any agreement with any dealer with regard to the spaces in the new section of the park (see fn. 6). The letter stated, "no development agreement has been entered into with respect to even one of the proposed new spaces at the park."[13]

Both before and after February 11, 2003, Parklane did not foreclose any prospective tenant from renting space in the park, nor did it require tenants to purchase a mobilehome from any particular dealer. Parklane indicated in the February 11, 2003, letter that Parklane had decided that funds were required to develop the new spaces and that each prospective tenant was free to choose anyone to assist with that endeavor, as long as the developer was not plaintiff. Further, the tenant could choose to buy a mobilehome from anyone, including plaintiff. Parklane was again, refusing to deal directly with plaintiff by refusing to provide plaintiff the ability to develop the spaces in the new section of the park. However, Parklane was not forcing its tenants to buy mobilehomes from any specific dealer. Parklane informed plaintiff that "although [Parklane] will not enter into a development agreement with you, if [a tenant's] contractor develops the space [Parklane] would not object to [the tenant] purchasing the mobilehome for that space from you, or from any other licensed dealer of [tenant's] choosing." Thus, the spaces in the new section of the park were not tied to mobilehomes sold by any particular dealer.

Lastly, defendant San Jose Advantage Homes, Inc., was the only dealer to develop the 29 spaces in the new section of the park. Thus, we fail to see how any other dealer could be a part of this "scheme." And, plaintiff alleged, and plaintiff's counsel conceded, that the reason other dealers did not decide to develop the new spaces was financial. Plaintiff alleged that the other dealers declined "solely because they could not afford" the development

---

[13] Plaintiff alleged that defendant San Jose Advantage Homes, Inc., began advertising the spaces in the new section of the park at the end of February 2003, after the February 11, 2003, letter. This allegation was supported by a copy of an *un*dated advertisement, exhibit 14.

The February 11, 2003, letter addressed plaintiff's accusation that he was not permitted to sell a mobilehome to a prospective tenant who wished to occupy space No. 19 in the new section of the park. (See fn. 6.) However, according, to plaintiff's exhibits and allegations, this space was not offered for sale by defendant San Jose Advantage Homes, Inc., in February 2003 and San Jose Advantage Homes, Inc., did not sell a mobilehome for that space until December 2003.

costs. The arrangement with defendant San Jose Advantage Homes, Inc., was not anticompetitive. Rather, it was based on economic reality.

■ The bottom line is that plaintiff was free to sell a mobilehome to any tenant in either the old or new section of Parklane. Parklane was merely refusing to do business directly with plaintiff.[14]

> d. Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc., supra, *101 Cal.App.3d 532.*

Plaintiff asserts that California does not share in the United States Supreme Court's view of anticompetitive acts that constitute illegal tying arrangements; there can be an illegal tying arrangement per se even if the tying arrangement involves only one park; and *Suburban, supra,* 101 Cal.App.3d 532 controls the discussion. Thus, according to plaintiff, he has stated a Cartwright Act violation.

There are a number of flaws in plaintiff's analysis.

First, even *Suburban, supra,* 101 Cal.App.3d 532, the case upon which plaintiff relies, has adopted the rationale of the United States Supreme Court

---

[14] Business and Professions Code section 16727 also prohibits some types of tying arrangements. It reads: "It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (*Ibid.*)

Business and Professions Code section 16727 is not applicable because the alleged tying product is real property. (*Suburban, supra,* 101 Cal.App.3d at pp. 549–550; *People v. Mobile Magic Sales, Inc.* (1979) 96 Cal.App.3d 1, 10 [157 Cal.Rptr. 749]; *Morrison v. Viacom, Inc., supra,* 66 Cal.App.4th at pp. 546–547.)

Plaintiff asserts that the focus of the Cartwright Act is on protection of the consumer, whereas the Sherman Act focuses on prevention of monopolies. Plaintiff notes that the Cartwright Act (Bus. & Prof. Code, §§ 16700–16760) does not contain the explicit prohibition against monopolization as is contained in the Sherman Act, 15 United States Code section 2, or mentioned in the last phrase of Business and Professions Code section 16727. Plaintiff then asserts that many cases discussing tying arrangements inartfully meld together the two concepts of protecting consumers and monopolization, without realizing their inherent distinctions. Then, plaintiff argues that the focus of this case is on protecting the consumer, who incurred significant injury by paying elevated prices for the mobilehomes purchased for placement in Parklane. However, this appeal is resolved by analyzing plaintiff's allegations that there is an illegal tying arrangement per se that purportedly violates Business and Professions Code section 16720. We conclude that plaintiff cannot establish the tie between the spaces and the purchase of mobilehomes. Thus, the distinction plaintiff makes is not significant.

cases, demonstrating that the federal anticompetition philosophy of the Sherman Act is often valuable in discussing the Cartwright Act. (See fn. 9.)

Second, *Suburban, supra,* 101 Cal.App.3d 532, has relied on outmoded concepts and third, *Suburban* is factually distinguishable.

In *Suburban, supra,* 101 Cal.App.3d 532, a mobilehome dealer (Suburban) sued an owner and developer (AMFAC) of a single mobilehome park (the Franciscan Bay Mobile Country Club (the Franciscan)) and three mobilehome dealers. AMFAC developed the Franciscan. It had 501 mobilehome sites capable of accommodating double-wide mobilehomes. (*Id.* at p. 538.) The Franciscan was an "outstanding five-star park [with] large spaces and full recreational facilities . . ." including a swimming pool. (*Ibid.*) It was the "only park close to San Francisco that had double-wide spaces available." (*Ibid.*) The Franciscan was "a unique park, both because of its location and superb facilities." (*Id.* at p. 539.) "Suburban had a waiting list of customers for the Franciscan; . . . there were numerous prospects (half a dozen a week) who wanted mobilehomes in the Franciscan; and . . . there were a number of concrete sales or potential sales which were lost because of the unavailability of mobilehome sites in the Franciscan to the Suburban customers." (*Ibid.*) "The other parks within commuting distance of San Francisco . . . with a few exceptions, were filled at the time the Franciscan opened in 1972." (*Id.* at p. 544.) At the outset, the Franciscan was an open park. But sometime in 1971, AMFAC entered into an agreement with four mobilehome dealers, including the three defendant dealers, by which these dealers had the exclusive right to model their mobilehomes in 288 spaces in the Franciscan. (*Id.* at p. 538.) For this right, the dealers were obligated to pay AMFAC a certain sum of money. (*Ibid.*) "[W]hile Suburban filled 90 to 95 percent of the mobilehome park vacancies in northern San Mateo County from 1971 to 1975, in the disputed period it could sell only 6 mobilehomes of the total of 253 sales in the park." (*Id.* at p. 539.)

*Suburban,* a case that was decided four years before *Jefferson Parish Hospital Dist. No. 2 v. Hyde, supra,* 466 U.S. 2, recognized that the key reason a tying arrangement is per se illegal is because a party's economic power with respect to the tying product is sufficient to restrain free competition in the market for the tied product. (*Suburban, supra,* 101 Cal.App.3d at p. 542.) It then went on to utilize the uniqueness of the park's location to conclude that there was an illegal tying arrangement per se.

In discussing AMFAC's market power, *Suburban* stated: "Before resorting to the record to show that AMFAC possessed sufficient economic power to impose an appreciable restraint on the free competition of the tied product (here, mobilehomes), we emphasize that the power over the tying product

(here, home sites) can be sufficient even though the power falls short of dominance and even though the power exists only with respect to some buyers in the market. As the cases unanimously underline, such crucial economic power may be *inferred* from the tying product's desirability to consumers or from uniqueness in its attributes [citations]." (*Suburban, supra,* 101 Cal.App.3d at p. 544, italics added.) For this proposition, *Suburban* relied upon *United States v. Loew's Inc.* (1962) 371 U.S. 38, 45 [9 L.Ed.2d 11, 83 S.Ct. 97], *Fortner Enterprises v. U. S. Steel* (1969) 394 U.S. 495, 503 [22 L.Ed.2d 495, 89 S.Ct. 1252] (*Fortner I*), and *Lessig v. Tidewater Oil Company* (9th Cir. 1964) 327 F.2d 459, 470.

■ However, in *Illinois Tool Works Inc. v. Independent Ink, Inc., supra,* 547 U.S. 28, the United States Supreme Court recently overruled this line of authority, including *United States v. Loew's Inc.* The Supreme Court held in *Illinois Tool Works Inc.* that the uniqueness of an item, such as a patent, cannot by itself be used to *infer* market power. Rather, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." (*Id.* at p. 46.)[15]

Further, there are many factual differences between *Suburban* and the case before us. *Suburban* involved accusations that the dealer was precluded from modeling in the Franciscan. In contrast, plaintiff has withdrawn all claims that he should be able to model in Parklane. In *Suburban,* the facts showed that there was a tie between the renting of the spaces and the eventual purchase of mobilehomes. Prospective tenants could only purchase mobilehomes from the few dealers designated by the park. Here, tenants could purchase mobilehomes from anyone, including plaintiff.

Also, plaintiff has not alleged the uniqueness or desirability shown in *Suburban.* Here, there are more than 30 mobilehome parks in the Santa Clarita Valley, where Parklane is located. According to plaintiff's allegations, Parklane is in the center of town not far from city hall, close to shopping and employment. However, plaintiff does not allege that the other parks do not have similar locations, but rather, plaintiff admitted that the nonparty closed parks also

---

[15] The rationale in *Fortner I, supra,* 394 U.S. 495 was rejected in *Fortner II, U.S. Steel Corp. v. Fortner Enterprises* (1977) 429 U.S. 610, 622 [51 L.Ed.2d 80, 97 S.Ct. 861] (*Fortner II*). "After the Court remanded the suit in *Fortner I,* a bench trial resulted in judgment for the plaintiff, and the case eventually made its way back to [the United States Supreme Court]. Upon return, [in *Fortner II,* the United States Supreme Court] unanimously held that the plaintiff's failure of proof on the issue of market power was fatal to its case . . . ." (*Illinois Tool Works Inc. v. Independent Ink, Inc., supra,* 547 U.S. at p. 36.)

In *Lessig v. Tidewater Oil Company, supra,* 327 F.2d 459, the Ninth Circuit relied on *Loew's* to observe that market power may be " 'inferred.' " (*Id.* at p. 470.) *Lessig* was also abrogated by *Spectrum Sports, Inc. v. McQuillan* (1993) 506 U.S. 447 [122 L.Ed.2d 247, 113 S.Ct. 884] (discussing 15 U.S.C. § 2 and attempt to monopolize).

had desirable locations. Plaintiff describes Parklane as the second largest park, with many amenities. But plaintiff fails to allege that other area parks do not have similar benefits. In *Suburban,* the park (the Franciscan) was the only park close to San Francisco that could accommodate double-wide mobilehomes. Plaintiff does not allege that Parklane was the only park that could accommodate a specific type of mobilehome. Plaintiff only alleges that the "vast majority" of the 19 nonparty open parks were either "unsuitable for installation of double-wide mobilehomes or are considered geographically or aesthetically undesirable to new home buyers." In *Suburban,* the four dealers controlled more than 50 percent of the Franciscan as they controlled 288 of the park's 501 spaces. Here, defendant dealers did not control 50 percent of the mobilehome spaces in the Santa Clarita Valley or 50 percent of the spaces in Parklane. Also, the Franciscan had a waiting list of potential tenants. There are no similar facts in the present case. Thus, *Suburban* does not control the analysis.

The trial court did not err in sustaining the demurrers without leave to amend as to plaintiff's cause of action for violation of the Cartwright Act.

### 3. *Plaintiff has waived his interference and UCL causes of action.*

In his opening brief, plaintiff only addresses the cause of action for violating the Cartwright Act. Plaintiff gives only passing reference to his other two causes of action. Thus, plaintiff has waived his interference with prospective economic advantage and UCL causes of action. In any event, the trial court properly sustained the demurrer on these two causes of action because, as plaintiff admits, they are based upon his Cartwright Act cause of action.

#### a. *Plaintiff cannot allege a cause of action for intentional interference with prospective economic advantage.*

■ "An interference with prospective economic advantage cause of action requires '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts. [Citation.]' [Citation.] The plaintiff must also 'prove that the defendant engaged in an independently wrongful act in disrupting the relationship. [Citation.] In this regard, "an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." [Citation.]' " (*SC Manufactured Homes, Inc. v. Canyon View Estates, Inc., supra,* 148 Cal.App.4th at p. 672, fn. 7.)

With regard to both the old section and the new section of Parklane, tenants and prospective tenants were not foreclosed from buying mobilehomes from plaintiff. With regard to the new section of Parklane, plaintiff was only foreclosed from acting as a joint venturer.

The only time plaintiff was precluded from any economic opportunity was when he wished to buy a mobilehome from one tenant and replace it with another in the hopes that he could sell a mobilehome to another tenant, or model. However, plaintiff has withdrawn all claims that he should be able to model mobilehomes in Parklane. Thus, plaintiff has not stated an interference cause of action.

b. *Plaintiff cannot allege a cause of action for violation of the UCL (Bus. & Prof. Code, § 17200 et seq.).*

■ "The UCL is designed to preserve fair business competition. [Citation.] It prohibits any 'unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law, Business and Professions Code section 17500 et seq.].' [Citation.]" (*SC Manufactured Homes, Inc. v. Canyon View Estates, Inc., supra,* 148 Cal.App.4th at p. 672, fn. 8.)

The UCL "governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527]; see *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc., supra,* 148 Cal.App.4th at p. 672, fn. 8.)

■ "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375 [113 Cal.Rptr.2d 175].) In that plaintiff cannot allege a Cartwright Act violation or a cause of action for intentional interference with prospective economic advantage, the cause of action for a violation of the UCL also cannot stand. To the extent plaintiff relies on violations of the MRL, plaintiff has waived such argument. Thus, plaintiff has not stated a UCL violation.

IV.

## DISPOSITION

The judgment is affirmed. Plaintiff is to bear all costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied May 19, 2008, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 13, 2008, S164043.