Filed 1/17/17; pub. order 2/6/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MICHAEL STELLA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ASSET MANAGEMENT CONSULTANTS, INC., et al.,<br><br>    Defendants and Respondents. | B269207<br><br>(Los Angeles County<br>Super. Ct. No. BC508056) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  Affirmed.

Catanzarite, Kenneth J. Catanzarite, Nicole M. Catanzarite-Woodward and Eric V. Anderton for Plaintiff and Appellant.

Jackson Tidus, M. Alim Malik and Charles M. Clark for Defendant and Respondent Asset Management Consultants, Inc.,

James R. Hopper, Gloria Hopper, AMC-Hamilton, LLC; AMC-Baker-Cal, LLC; AMC-Overland, LLC; AMC-Wilnaldi, LLC; AMC-Capom, LLC; AMC-Arbor Square, LLC and AMC-Packard, LLC.

Jampol Zimet, Marc J. Zimet and Steven J. Markowitz for Defendant and Respondent Property Mangement Associates, Inc., LM Property Service, Inc., Thomas Spear and Joshua Fein.

Goshgarian & Marshall, John A. Marshall and Mark S. Reusch for Defendant and Appellant Davies Lemmis Raphaely Law Corporatoin, Merton Randel Davies and Rosemary Lemmis.

Cadden & Fuller, Thomas H. Cadden and John B. Taylor for Defendant and Respondent Allen L. Basso, Smith, Linden & Basso, LLP, Allen A. Basso and August Real Estate Enterprises, LP.

Law Offices of Anthony C. Duffy and Anthony C. Duffy for Defendant and Appellant Kevin James Hopper.

Greenwald & Hoffman, Paul A. Hoffman and John R. Flocken for Defendant and Respondent Hamilton Venture, L.P., Baker-Cal Venture, L.P., Overland Venture, L.P., Wilnaldi Venture, L.P., Capom Venture, L.P., Arbor Square Venture, L.P. and Packsard Venture, L.P.

_____

Michael Stella appeals from the judgment of dismissal entered after a judicial referee, appointed pursuant to Code of

2

Civil Procedure section 638,[1] sustained without leave to amend the demurrers of all defendants to Stella's first amended complaint for intentional misrepresentation, fraud by concealment and related common law and statutory causes of action. Stella contends the referee misapplied the delayed discovery rule and, as a result, incorrectly concluded each of his claims was barred as a matter of law by the applicable statute of limitations. He also contends the trial court erred in enforcing the judicial reference provisions in the limited partnership agreements at issue in the case. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Limited Partnership Investments*

From February 2007 through February 2009 Stella invested in seven limited partnerships, each of which was formed to acquire ownership of specific real property either as a tenant in common or as the sole owner of the property.[2] Stella had previously made multiple investments over a period of approximately 20 years with defendants Asset Management

---

[1]  Statutory references are to this code unless otherwise stated.

[2]  The limited partnerships at issue are Hamilton Venture, L.P., Baker-Cal Venture, L.P., Overland Venture, L.P., Wilnaldi Venture, L.P., Capom Venture, L.P., Arbor Square Venture, L.P., and Packard Venture, L.P. Each of the limited partnerships is named a defendant in Stella's operative first amended complaint, as are the general partners of each limited partnership, AMC-Hamilton LLC, AMC-Baker-Cal LLC, AMC-Overland LLC, AMC-Wilnaldi LLC, AMC-Capom LLC, AMC-Arbor Square LLC and AMC-Packard LLC.

Consultants, Inc. (AMC) and its principals James Hopper and Gloria Hopper.

Stella was solicited to invest in the limited partnerships through a separate private placement memorandum prepared for each of the investments by AMC.[3]  Stella acknowledged he read the private placement memoranda prior to investing.  In addition, in connection with each investment Stella signed a subscription agreement, which certified his status as an accredited (qualified) investor, and a limited partnership agreement.  The parties agree the documentation for each of the limited partnerships (that is, the private placement memorandum, a subscription agreement and the limited partnership agreement) was essentially identical,[4] and the issues presented by Stella's appeal are the same as they relate to the seven investments.

According to Stella's description of the role of various entities and individuals named as defendants in his lawsuit, Property Management Associates, Inc., LM Property Services, Inc., Thomas Spear and Joshua Fein were responsible for overseeing the due diligence for each of the real property acquisitions by the limited partnerships.  Davies Lemmis

---

[3]     We accept as true all facts properly pleaded in Stella's operative first amended complaint to determine whether the demurrer was properly sustained.  (*Beacon Residential Community Assn. v. Skidmore, Owings, & Merrill LLP* (2014) 59 Cal.4th 568, 571.)

[4]     The limited partnerships differed in the commercial properties to be acquired, the purchase price for the properties, the amount of the commission paid to the general partner and the size of the limited partnership offerings.

Raphaely Law Corporation, Merton Randel Davies and Rosemary Lemmis (lawyer defendants) were legal counsel for AMC. Kevin Hopper also provided legal services to AMC and acted, either directly or indirectly, as manager for the general partners of the limited partnerships. Smith, Linden & Basso, LLP and Allen L. Basso acted as accountants for the various entities, and Allen L. Basso and Allen A. Basso, as well as August Real Estate Enterprises, L.P., provided real estate services in connection with the investment transactions.

a. *The private placement memoranda*

Using the documents for Hamilton Venture, L.P. as the exemplar, as Stella does in his opening brief,[5] the private placement memorandum explained the limited partnership was being formed to acquire, operate and sell a two-story office building in Torrance, California over a six-to-nine-year period. The total purchase price for the property was $14,735,000.

The offering was for 332 limited partnership units at $10,000 per unit with a minimum subscription of two units. In addition to the $3,320,000 to be contributed by the limited partnership, co-owners of the property would contribute $949,400; and a loan for $10,845,000 secured by a first deed of trust would be obtained, "which is approximately 73.60% of the Purchase Price of the Property." Investors were advised the total price for the property "includes a Five Hundred Sixty-Five Thousand Dollars ($565,000) real estate commission to be paid to AMC by the Seller at closing . . . portions of which will be paid to

---

[5] Hamilton Ventures, L.P. was the earliest of the limited partnership offerings at issue in this litigation. It was originally scheduled to close on February 23, 2007 and actually closed the following month.

the General Partner and other parties involved in the purchase of the Property and/or the funding of the Partnership."

The private placement memorandum stated the business plan for the acquisition was, in part, to "[a]cquire the Property at a price that is below the replacement cost." The total funding for the project was $15,114,400. The Use of Proceeds section of the private placement memorandum repeated that the purchase price of the property was $14,735,000 and described organizational fees, general and administrative costs, legal fees, acquisition and due diligence fees of $75,000; miscellaneous closing costs of $110,513; loan origination fees and costs of $138,450; and working capital and reserves of $55,437. The discussion of use of funds also stated, in the event the fees and costs described were less than estimated, "the excess will be added to operating reserves or returned to Partners at the discretion of the General Partner."

The Risk Factors section of the private placement memorandum contained the following caution in its listing of "operating risks": "Market Value of Property. The purchase price of the Property has been negotiated to include a commission to be paid to Manager of the General Partner of the General Partner's Manager by the Seller (see 'General Partner's Compensation and Fees') in addition to other brokerage commissions owed by the Seller. Accordingly, the Seller would have sold the Property for a lower Purchase Price if it were not obligated to pay such commission. Although the General Partner believes that the Purchase Price fairly corresponds to the market value of the Property, and it is expected that the Property will be appraised for that amount by the lender financing the

6

acquisition, there is no assurance that the Partnership will be able to sell the Property for such amount."

On page 4 of the Private Placement Memorandum, in all capital letters, investors were warned, "These Securities Involve A High Degree Of Risk As Described In This Memorandum Under The Caption 'Risk Factors.'" On the following page, also in all capital letters, the investors were again advised, "See 'Risk Factors' For A Discussion Of Certain Factors That Should Be Considered In Connection With This Offering." Paragraph 1.B. of the representations and acknowledgments in the subscription agreement, initialed by Stella, provided, "I have reviewed the Confidential Private Placement Memorandum that accompanies this Subscription Agreement, including the discussion of the Risk Factors contained in that Memorandum."

b. *The limited partnership agreements*

Paragraph 6.6.2 of each of the seven limited partnership agreements repeated the private placement memorandum's description of the real estate commission. The Hamilton Venture, for example, provided, "Brokerage Commission upon Acquisition. At the closing of the acquisition of the Property, Asset Management Consultants, Inc. ('AMC'), which is the manager of the General Partner's manager, will receive a real estate commission in the amount of Five Hundred Sixty Five Thousand Dollars ($565,000) from the seller of the property. This commission will be distributed in part by AMC to the General Partner, its principals and affiliates and/or other parties and entities who have assisted in the purchase of the Property and/or the funding of the Partnership."

Each limited partnership agreement also contained in paragraph 13.8 a dispute resolution provision that mandated use

7

of a judicial reference pursuant to section 638: "Dispute Resolution. Any controversy, claim, action or dispute arising out of or relating to this Agreement, shall be heard in a court of competent jurisdiction in the County of Los Angeles, State of California, by a reference pursuant to the provisions of the California Code of Civil Procedure Sections 638 through 645.1, inclusive . . . . [¶] . . . [¶] . . . The referee shall have the power to decide all issues of fact and law and report his/her decision thereon, and to issue all legal and equitable relief appropriate under the circumstances . . . ."

c. *Stella's investments*

Stella purchased four limited partnership units ($40,000) in Hamilton Venture, L.P. in March 2007. He completed his acquisitions of limited partnership units in the other six limited partnerships in July 2007 ($40,000), May 2008 ($20,000), August 2008 ($20,000), October 2008 ($20,000), January 2009 ($20,000) and February 2009 ($20,000).

2. *Stella's Lawsuit*

On May 6, 2013—more than six years after the close of the Hamilton Venture, L.P. offering and more than four years after the close of the Packard Venture LP, the last of the seven limited partnership investments—Stella filed a 41-page putative class action complaint for intentional misrepresentation, fraud by concealment and related common law and statutory causes of action on behalf of himself and other limited partner investors against AMC, the seven limited partnerships, their general partners and the various entities and individuals Stella believed were responsible for the preparation and distribution of the private placement memoranda used to solicit the limited partnership investments. On April 17, 2015, while a demurrer on

8

statute of limitations grounds was pending, Stella filed a 193-page first amended complaint—the operative pleading—which alleged nine causes of action (identified as the first through ninth claims for relief) as to each of the seven limited partnership transactions:  intentional misrepresentation, fraud by concealment, negligent misrepresentation, negligence, violations of California Corporations Code sections 25401 (fraudulent marketing of securities), 25504 (control person liability) and 25504.1 (materially aiding the fraudulent sale of securities), breach of fiduciary duty and unfair business practices in violation of the Business and Professions Code section 17200 et seq.[6]  Different groupings of defendants were named in the various claims with some (in particular, AMC and the Hoppers) included in all nine causes of action.

The gravamen of the lawsuit was that the private placement memoranda's description of a real estate commission to be paid by the seller of the property at closing ($565,000 in the Hamilton Venture transaction) was false.[7]  In fact, the payment was not a real estate commission but a syndication fee or markup, the economic burden of which was borne by the purchasers of the limit partnership units, not the seller of the

_____

[6]    Each claim for relief contained seven "counts," one for each of the limited partnership transactions in which Stella invested, except the ninth claim for violating the UCL, which was simply asserted against "all defendants."

[7]    The real estate commission identified in the private placement memorandum for the Baker-Cal Venture was $1,425,000; for Overland Venture, $800,000; for Wilnaldi Venture, $275,000; for Capom Venture, $280,000; for AMC-Arbor Square, $275,000; and for AMC-Packard, $250,000.

real property.  That is, the purported real estate commission did not reduce the negotiated purchase price received by the seller, as it would if the seller truly paid the commission, but was added to the negotiated price so that its economic burden was shifted to the investors, thereby diluting the value of the investment.  As a result of this fundamental misrepresentation, Stella alleged the private placement memoranda contained additional false representations or misleading half-truths concerning the fair market value of the property, the appraised value of the property, the loan-to-cash value ratio and the compensation to be received by the general partner of the limited partnership.[8]

Stella alleged AMC and the other defendants knew these representations were false and intended the investors to rely on them.  He also alleged he and the investor classes he sought to represent read the private placement memoranda and reasonably relied on the misrepresentations contained in them.

Recognizing the limitations issue confronting his lawsuit, Stella included a section in the first amended complaint labeled "Application of Delayed Discovery Rule," which alleged he had first discovered the misrepresentations concerning the seller-paid commissions on April 14, 2012 when he was contacted by counsel in connection with another investment made by Stella:  "Prior to this discussion with counsel, [Stella] was completely unaware that proceeds from his investment were used to satisfy this economic burden and had no suspicion of the same."

---

[8]     The private placement memoranda for the seven limited partnership investments were attached as exhibits to the first amended complaint.

10

### 3. *Appointment of the Judicial Referee*

Following the filing of the original complaint, all defendants filed or joined motions for a general reference pursuant to section 638 and the dispute resolution provisions of the limited partnership agreements. Stella objected, arguing the fraud and fraud-related claims asserted in the complaint did not arise out of or relate to the limited partnership agreements, several of the defendants (in particular, AMC and the Hoppers) were not parties to the limited partnership agreements and had not consented to a general reference, and the judicial reference provisions in the limited partnership agreements were both procedurally and substantively unconscionable. The trial court granted the motions on May 6, 2014 and appointed retired superior court judge James L. Smith as referee in September 2014.

### 4. *The Defendants' Demurrers*

Stella filed his first amended complaint after the appointment of the referee. All defendants demurred or joined in the demurrers filed by other defendants. After briefing and oral argument the referee issued a statement of decision, reported to the trial court pursuant to section 643, subdivision (a), sustaining the demurrers without leave to amend. The referee found all causes of action barred by the governing statutes of limitations (two, three or four years from date of discovery)[9] because, when

---

[9] The lawyer defendants contend all claims against them not based on actual fraud (for example, breach of fiduciary duty and violation of the UCL) are governed by section 340.6's limitations period (one year from date of discovery but no longer than four years from the date of the alleged wrongful conduct). Accordingly, they argue, even if Stella did not discover their

11

he received and reviewed the private placement memoranda, Stella was either aware or, as a reasonable person, should have conducted the due diligence required to inform himself that the purchase price recited in the private placement memoranda had been increased over that for which the property otherwise could have been purchased to facilitate payment of the fee labeled "real estate commission." The referee explained, "It is difficult to discern how Plaintiff could have been more clearly advised of the impact the Seller's payment of the Commissions would have on the purchase price of the properties than by the statement in the [private placement memorandum] that, 'Accordingly, the Seller would have sold the Property for a lower Purchase Price if it were not obligated to pay such commission.'" The referee found that disclosure language was clear and unambiguous and triggered the running of the limitations periods as of the date Stella purchased the limited partnership units—more than four years before he filed his original complaint. "Plaintiff's contention that accrual of any of his causes of action [was] delayed based on his lack of knowledge of his injury is unsupported by the allegations in the [first amended complaint]."

Defendants moved for entry of judgment pursuant to section 644. The trial court granted the motion. Judgment was

---

alleged wrongful conduct until April 14, 2012 as he has alleged, the non-fraud-based causes of action are time-barred because the lawsuit was not filed until May 6, 2013, more than one year later. In reply Stella insists the gravamen of all claims against the lawyer defendants is actual fraud. In light of our conclusion that Stella had inquiry notice, if not actual notice, prior to the close of each investment based on the disclosures in the private placement memoranda, we need not resolve that issue.

12

entered on November 16, 2015.  Stella filed a timely notice of appeal.

**DISCUSSION**

1. *Standard of Review*

A demurrer tests the legal sufficiency of the factual allegations in a complaint.  We independently review the superior court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense.  (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; *Committee For Green Foothills v. Santa Clara Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.)  We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken.  (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  We liberally construe the pleading with a view to substantial justice between the parties (Code Civ. Proc., § 452; *Gilkyson v. Disney Enterprises, Inc.* (2016) 244 Cal.App.4th 1336, 1340; see *Schifando*, at p. 1081 [complaint must be read in context and given a reasonable interpretation]); but, "[u]nder the doctrine of truthful pleading, the courts 'will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed.'"  (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400; see *Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 767 ["[w]hile the 'allegations [of a complaint] must be accepted as true for purposes of demurer,' the 'facts appearing in exhibits attached to the complaint will also be accepted as true and, if contrary to the allegations in the

13

pleading, will be given precedence'"]; *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 83 ["[i]f the allegations in the complaint conflict with the exhibits, we rely on and accept as true the contents of the exhibits"].)

Although a general demurrer does not ordinarily reach affirmative defenses, it "will lie where the complaint 'has included allegations that *clearly* disclose some defense or bar to recovery.'" (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183; accord, *Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1406; *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 224.) "Thus, a demurrer based on an affirmative defense will be sustained only where the face of the complaint discloses that the action is necessarily barred by the defense." (*Casterson,* at p. 183; accord, *Favila,* at p. 224; see *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 [application of a statute of limitations based on facts alleged in a complaint is a legal question subject to de novo review].)

Section 638, subdivision (a), provides that a referee may be appointed by agreement of the parties to "hear and determine any or all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision." The judgment based on a statement of decision following a consensual general reference is treated as if the action had been heard by the court (Code Civ. Proc., § 644, subd. (a)) and is reviewed on appeal using the same rules that apply to a decision by the trial court. (See *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.)

2. *All of Stella's Causes of Action Are Time-barred*

Traditionally, a claim accrues '"when [it] is complete with all of its elements"—those elements being wrongdoing [or

14

breach], harm, and causation.'" (*Aryeh v. Canon Business Solutions, Inc., supra,* 55 Cal.4th at p. 1191; accord, *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 815.) "This is [known as] the 'last element' accrual rule . . . ." (*Aryeh,* at p. 1191; see *ibid.* ["ordinarily, the statute of limitations runs from 'the occurrence of the last element essential to the cause of action'"]; *Howard Jarvis,* at p. 815 [same]; *Quarry v. Doe I* (2012) 53 Cal.4th 945, 960.)

An exception to the general rule of accrual is the delayed discovery rule, "which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.'" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Id.* at p. 1111.)

Stella alleged the misrepresentations and material omissions occurred at the time of each limited partnership transaction and, as a result, has acknowledged all his causes of action, whether governed by a two-, three- or four-year statute of limitations, are time-barred absent application of the delayed discovery rule to postpone accrual of the statutes of limitations. That is, unless the discovery rule applies, Stella was injured and

15

the statute of limitations on his various causes of action began to run when he purchased limited partnership units in each of the seven investment transactions based on what he now deems to be an artificially inflated purchase price for the commercial properties acquired by the limited partnerships.  (See *WA Southwest 2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 156, fn. 6 (*WA Southwest*) ["[r]eceipt of investment disclosures can trigger the statute of limitations in appropriate cases"].)  However, Stella argues he adequately pleaded facts demonstrating he was unaware of the false representations concerning the nature of the "real estate commission" to be paid to AMC until April 2012 and could not have discovered the true nature of that charge any earlier despite exercising reasonable diligence.  (See *Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at p. 815 ["[a] plaintiff seeking to utilize the discovery rule must plead facts to show his or her inability to have discovered the necessary information earlier despite reasonable diligence"].)

As discussed, Stella pleaded he first discovered the misrepresentations regarding the purchase price and seller-paid commissions in the transactions at issue in this case on April 14, 2012—slightly more than one year before he filed his original complaint—following a conversation with counsel for investors in another limited partnership transaction sponsored by several of the defendants.  Stella also alleged he had no reason to suspect the private placement memoranda were materially false prior to that time because he trusted the Hoppers and AMC, with whom he had a 20-year investment relationship, and further alleged a reasonable investigation at the time of the limited partnership offerings would not have revealed the false representations and

16

omissions because the defendants were the only sources of information concerning the investments.

When a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in this case, the allegations in the complaint and facts properly subject to judicial notice) can support only one reasonable conclusion. (*Jolly v. Eli Lilly & Co.*, *supra*, 44 Cal.3d at p. 1112; *Broberg v. The Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 921 (*Broberg*).) That is the case here: Stella's allegations fail, as a matter of law, to trigger the delayed discovery rule given the clear and specific statements in the private placement memoranda, which Stella admits he read and relied on, that the purchase price for the properties acquired by the limited partnerships had been negotiated to include the commission to be paid to AMC and related entities in addition to other brokerage commissions owed by the seller and the additional unambiguous explanation, "the Seller would have sold the Property for a lower Purchase Price if it were not obligated to pay such commission." Those disclosures provided actual notice that the investors, not the sellers of the real property being acquired for the limited partnerships, bore the economic burden of the challenged "real estate commission." At the very least, those statements put Stella and other sophisticated investors who received the private placement memoranda on notice that further inquiry was necessary. "Reasonable diligence in such circumstances does not consist of ignoring a private placement memorandum received

17

prior to making an investment." (*WA Southwest, supra,* 240 Cal.App.4th at p. 157.)[10]

Contesting this conclusion by relying on language in *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97 (*Fremont Indemnity*), Stella argues it was improper for the referee on demurrer (and, inferentially, for this court in conducting our de novo review of his ruling) to interpret the private placement memoranda, even though they were attached as exhibits to the complaint, rather than accepting the meaning of those documents proffered by Stella in the first

---

[10]     In *WA Southwest, supra,* 240 Cal.App.4th 148 investors who acquired tenant-in-common interests in a commercial real estate building alleged they had been misled by misrepresentations and deceptive statements about the "sales load" (described as fees, expenses and commissions paid) and degree of risk of the investment. (*Id.* at p. 152.) However, the private placement memorandum provided to the investors warned of the speculative nature of the investment and described the various sales load items they challenged. (*Id.* at p. 154.) The Court of Appeal affirmed the trial court's ruling sustaining demurrers on statute of limitation grounds, rejecting the investors' argument the statutes began to run only when they consulted tax and accounting experts six years after their investment: "The problem with this position is that the private placement memorandum provided to plaintiffs prior to their investments clearly disclosed the fees, expenses, and commissions that would be paid out of their cash investments, as well as the risky nature of the investments. . . . The information and disclosures in the private placement memorandum put plaintiffs on notice of the falsity of any communications they may have received about the sales load, tax advantages, or risk-free nature of the investments. The delayed discovery rule does not apply." (*Id.* at p. 157.)

18

amended complaint. Stella then contends the actual content of the market value risk factor disclosure in the private placement memoranda, as opposed to the referee's interpretation of that language, was insufficient to establish as a matter of law that at the time of his investments Stella knew or as was on inquiry notice that the private placement memoranda contained material false statements, misleading half-truths and omissions.

Stella misconstrues the holding of *Fremont Indemnity* and misstates its applicability to the delayed discovery issue presented by defendants' demurrers. In *Fremont Indemnity* the plaintiff alleged, in part, that defendants had misappropriated certain funds and that their conduct was not excused by the terms of a July 2, 2002 letter agreement among the parties. The complaint did not detail the terms of the purported agreement or attach a copy of the letter agreement to the pleading. (*Fremont Indemnity*, *supra*, 148 Cal.App.4th at pp. 112-113.) The demurring parties requested judicial notice of a July 2, 2002 letter agreement and argued under the terms of the agreement they had been released from any liability to plaintiff for the purported misappropriation. (*Id.* at p. 113.) That interpretation of the July 2, 2002 letter agreement was disputed. (*Id.* at p. 115.) After the trial court sustained the demurrer, our colleagues in Division Three of this court held the trial court had improperly taken judicial notice of the meaning and enforceability of the letter agreement, noting that the plaintiff had not alleged the letter agreement was an enforceable contract: "For a court to take judicial notice of the meaning of a document submitted by a demurring party based on the document alone, without allowing the parties an opportunity to present extrinsic evidence of the meaning of the document, would be improper. . . . [A] court

19

cannot by means of judicial notice convert a demurrer into an incomplete evidentiary hearing in which the demurring party can present documentary evidence and the opposing party is bound by what that evidence appears to show." (*Id*. at pp. 114-115.) Because the plaintiff "d[id] not rely on the letter dated July 2, 2002, to support a cause of action and did not attach a copy of the letter to its complaint, [it was] not precluded from presenting extrinsic evidence concerning the enforceability and proper interpretation of the letter." (*Id*. at pp. 118.)

Unlike *Fremont Indemnity* the case at bar does not concern the interpretation of the terms of an agreement or enforceability of a contract. Indeed, Stella has never suggested extrinsic evidence was required to properly construe the provisions of the private placement memoranda upon which he based his fraud and related common law and statutory claims.[11] To the contrary, Stella has relied on the plain meaning and ordinary understanding of statements in the private placement memoranda to allege the limited partnership units were marketed by fraudulent and misleading statements. It is entirely appropriate under these circumstances for the trial court (and this court on appeal) also to look to the plain meaning and ordinary understanding of the market risk disclosures to determine whether Stella was placed on at least inquiry notice concerning the defendants' purported wrongdoing at the time of his investments. (See, e.g., *WA Southwest*, *supra*, 240 Cal.App.4th at pp. 151, 153-155, 157 [utilizing information

---

[11] Unlike the plaintiff in *Fremont Indemnity*, Stella attached copies of the documents at issue (the private placement memoranda) to his first amended complaint and relied on them to support each of his causes of action.

and disclosures in private placement memorandum to determine on demurrer that plaintiffs were on notice of falsity of defendants' communications at the time of their investment]; see also *Brakke v. Economic Concepts, Inc.*, *supra*, 213 Cal.App.4th at p. 767 [contents of exhibits attached to pleading must be given precedence over inconsistent allegations in the pleading]*; SC Manufactured Homes, Inc. v. Liebert*, *supra*, 162 Cal.App.4th at p. 83 [same].)

Similarly, this court's decision in *Broberg*, *supra*, 171 Cal.App.4th 912, upon which Stella places heavy reliance, does not require a different result. In *Broberg* we reversed the dismissal of an insured's lawsuit for fraud and unfair competition against his insurer and the insurer's agent after the trial court sustained demurrers without leave to amend. The insured had alleged he had been falsely promised by the agent the earnings from a whole life insurance policy would be sufficient to pay the premium costs after the 11th year and had been given misleading marketing materials that similarly represented that out-of-pocket premium costs would be eliminated in the 12th year of the policy's life—a "vanishing premium" policy. (*Id.* at p. 914.) The lawsuit was filed 11 years after the policy had been sold; the insured alleged he had not discovered the misrepresentations until billed for additional premium for year 12. (*Id.* at p. 916.) The trial court sustained the insurer's and the agent's demurrers, ruling the claims had accrued when the policy was purchased and disclaimers in the policy gave the insured at least inquiry notice that earnings from the policy were not guaranteed, thus

21

precluding application of the delayed discovery rule. (*Id.* at pp. 916, 918.)[12]

We reversed, holding there was a question for the trier of fact whether the insured's reliance on the insurer's deceptive policy illustration and its agent's promise that out-of-pocket premiums would not be required after the 11th year of the policy was manifestly unreasonable. (*Broberg*, *supra*, 171 Cal.App.4th at p. 922.) We explained, "[T]he placement of the disclaimers (buried in a sea of same-sized, capitalized print), coupled with the absence of any cautionary language on the first page of the policy illustration, which contains the deceptive language and figures indicating [the insured's] out-of-pocket payments will 'vanish,' preclude a determination the disclaimers are adequate as a matter of law." (*Ibid.*) In addition, we rejected the insurer's contention that the insured was on inquiry notice when he purchased the policy because a policy term provided that premiums would be payable for life. We pointed out the insured "does not allege he was told *premiums* would stop, rather that premiums after the 11th year would be paid from earnings from the policy and that no further out-of-pocket *payments* would be required. Accordingly, even though [the insured] may be charged with knowledge of the terms of the policy he received, nothing in the policy itself was inconsistent with the misrepresentations on which the lawsuit is based." (*Id.* at p. 923.)

---

[12] The trial court also ruled the disclaimers as a matter of law precluded proof of justifiable reliance on any contrary promises by the insurer and its agent. (*Broberg*, *supra*, 171 Cal.App.4th at p. 918.) We also reversed that aspect of the court's ruling sustaining the demurrers. (*Id.* at pp. 922-923.)

22

Here, in sharp contrast to *Broberg*, there was no allegation that any of the defendants made a false promise to Stella. Rather, his claims of fraud and other actionable misconduct rest on his understanding that a seller-paid commission generally would not affect the fair-market-value/selling price of property, thus the description of the markup to be paid to AMC as a commission paid by the seller was false or misleading. Whether, as in *Broberg*, nonconspicuous disclaimers are adequate to negate an express promise and misleading marketing materials as a matter of law is very different from the question in this case whether an investor's subjective understanding of the meaning of a phrase in an investment document must be accepted at face value or whether, at the very least, an obligation to inquire further arose when the investment disclosures themselves contained information that directly contradicted that understanding.

Stella and the other limited partner investors were cautioned on the first page of each private placement memorandum that the partnership units being offered "are speculative and involve a high degree of risk" and were encouraged to retain their own counsel and accountant to review the investment. That high-risk warning was repeated on page four of the private placement memorandum and then again on page nine with specific directions to the potential investor to review the "risk factors" included in the memorandum. The risk factors, in turn, disclosed that the price paid to acquire the property had been increased beyond what the seller would have otherwise accepted to accommodate the commission to be paid to AMC. When he signed the subscription agreements for each limited partnership offering, Stella acknowledged he had

reviewed this section of the private placement memoranda. His failure to conduct any further inquiry into the meaning of that disclosure or the relationship between the increase in the purchase price caused by the commission and the value of his investment—that is, to exercise reasonable diligence—precludes application of the delayed discovery rule to rescue his untimely claims.

The clear import of the market value risk factor disclosure is not made less certain, as Stella suggests, by the additional statement that the general partner "believes that the Purchase Price fairly corresponds to the market value of the Property, and it is expected that the Property will be appraised for that amount by the lender financing the acquisition . . . ." First, as Stella necessarily acknowledges, the statement goes on to caution "there is no assurance that the Partnership will be able to sell the Property for such amount." Second, the private placement memoranda each contained a warning concerning forward-looking statements, which were defined as "statements containing the words 'believes,' 'assume,' 'will,' 'may,' 'might" and words of similar importance," cautioning that such forward-looking statements involved known and unknown risks and uncertainties that might cause actual results to be materially different from the performance expressed or implied by those statements. Given the explicit notice that the commission figure had been added to the price the seller would have accepted for the property, any suggested relationship between the ultimate purchase price and the market value or anticipated lender appraised value for the property, expressed as a belief or

expectation, could not be accepted without further inquiry—an inquiry that Stella conceded he never made.[13]

In sum, the private placement memoranda attached as exhibits to Stella's first amended complaint, rather than the conclusory allegations in the pleading itself, establish that Stella had inquiry notice, if not actual notice, of the alleged wrongdoing at the time the transactions closed. The delayed discovery rule does not apply, and the demurrers were properly sustained without leave to amend.[14]

_____

[13] Stella's allegation he had a fiduciary relationship with certain of the defendants based on his past investments with them does not alter the analysis. While it is true a plaintiff's burden of discovery is reduced when he or she is in a fiduciary relationship with another individual (see *WA Southwest*, *supra*, 240 Cal.App.4th at p. 157), "even assuming for the sake of argument that each of the respondents had a fiduciary duty to plaintiffs, this does not mean that plaintiffs had no duty of inquiry if they were put on notice of a breach of such duty." (*Ibid*.) The information and disclosures in the private placement memorandum put Stella on clear notice of any misstatements elsewhere in that document regarding the "real estate commission" and its impact on the use of investors' funds; whether or not any defendant owed him a fiduciary obligation, he was obligated to make further inquiry.

[14] Although Stella correctly states the trial court abuses its discretion if it sustains a demurrer without leave to amend if the pleading defect can be cured, he does not identify any additional facts he can allege that would justify application of the delayed discovery rule in this case. (See *Schifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081 ["plaintiff has the burden of proving that an amendment would cure the defect"].)

### 3. *Any Error in Ordering a Section 638 General Reference Was Harmless*

Stella advances several grounds to argue the trial court erred in ordering a general reference pursuant to section 638. He contends, for example, the dispute resolution provision in the limited partnership agreements is unenforceable because it does not unambiguously establish a forum other than a judicial forum; the scope of the dispute resolution provision does not include fraud in the solicitation and sale of the limited partnership units; and those defendants who were not signatories to the limited partnership agreement lacked standing to compel a judicial reference.

Even if Stella were correct on one or more of these points, however, the error in appointing a referee is grounds for reversal only if it resulted in a "miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred. (Cal. Cons., art. VI, § 13 ["[n]o judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of his resulted in a miscarriage of justice"]; § 475 ["[n]o judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"]; see *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780,

26

800; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)  The burden rests with the party claiming error to demonstrate not only error but also the resulting prejudice.  (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181, 1196-1197; *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 51-52.)

We have reviewed the ruling on the demurrers de novo and determined each cause of action alleged in the first amended complaint is time-barred as a matter of law.  Accordingly, whether the initial decision to sustain the demurrers was made by a referee pursuant to section 638 or the trial court could not possibly have affected the outcome of the case.

## DISPOSITION

The judgment of dismissal is affirmed.  Defendants are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.

27

Filed 2/6/17

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MICHAEL STELLA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ASSET MANAGEMENT<br>CONSULTANTS, INC., et al.,<br><br>    Defendants and<br>Respondents. | B269207<br><br>(Los Angeles County<br>Super. Ct. No. BC508056)<br><br>ORDER CERTIFYING<br>OPINION<br>FOR PUBLICATION AND<br>DENYING PETITION FOR<br>REHEARING<br>(NO CHANGE IN<br>JUDGMENT) |

THE COURT:

The opinion in this case filed January 17, 2017 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), respondents' request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

IT IS FURTHER ORDERED that appellant's petition for rehearing is denied.   There is no change in judgment.

_____
PERLUSS, P. J.          ZELON, J.          SEGAL, J.