Filed 1/19/21  Marcus v. LifePoint Wealth Management CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MARLENE MARCUS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LIFEPOINT WEALTH MANAGEMENT, INC., et al.,<br><br>Defendants and Respondents. | B293837<br><br>(Los Angeles County Super. Ct. No. BC650318) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Sanford M. Passman for Plaintiff and Appellant.

Markun Zusman Freniere & Compton, Jeffrey K. Compton and Daria D. Carlson for Defendants and Respondents.

_____

Marlene Marcus appeals from a judgment entered after the trial court granted the summary judgment motion filed by insurance broker Roderick Uy and his company LifePoint Wealth Management, Inc. (LifePoint).  Marcus sued Uy and LifePoint for breach of fiduciary duty, fraud, negligence, and related claims, alleging Uy induced her to purchase three life insurance policies that were unnecessary and ill-suited to her needs.  The trial court found Marcus's claims were time-barred because they accrued when the policies were issued, outside of all applicable limitations periods.  On appeal, Marcus contends triable issues of material fact existed whether the delayed discovery of her injuries deferred accrual and preserved her claims.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Uy Meets and Advises Marcus on Life Insurance in 2011*[1]

Uy is a California licensed insurance agent and wealth advisor doing business through LifePoint.  In mid-2011 Uy contacted Marcus by telephone following a referral from Marcus's tax accountant.  At that time Marcus was in her late 50's and unmarried, with two adult children, Branden and Michelle.  Marcus, who holds a law degree, owned a fabric store and several real estate investments, and she had an annual income of approximately $472,000.

Following Uy's initial contact, Marcus and Uy met several times, telephonically and later in person, and they discussed

---

[1]    The factual background is taken from the evidence submitted by the parties in connection with defendants' motion for summary judgment.  We indicate where the evidence is in dispute.

2

Marcus's financial planning goals and concerns at length. Marcus told Uy she had been engaged in bitter litigation with her siblings for many years over the disposition of her parents' estate, and she had a dispute with the Internal Revenue Service regarding the estate taxes. Marcus therefore wanted to create a wealth plan to manage her affairs upon her death or disability, to protect the family business, to minimize the estate taxes, and to prevent her children from becoming embroiled in disputes over her estate. Because Marcus had been forced to sell off real estate to pay the estate taxes on her inheritance, Marcus was interested in life insurance with a benefit sufficient to cover the taxes on her own estate. Marcus also wanted her children to have access to funds that would allow them, if she became ill, to pay her medical expenses without having to rely on their own money.

When Marcus met Uy, she had a $6 million life insurance policy with Lincoln National Life Insurance Company and paid premiums on two $2 million policies with Jefferson Pilot Life Insurance, one held by her daughter Michelle and one held by her son Branden. Marcus was unsure of her net worth and did not know how much additional life insurance she would need to meet her goals. Accordingly, upon Uy's recommendation, Marcus sent information concerning her finances to GamePlan Financial Marketing, a field marketing organization Uy regularly used, to prepare an estimate of her net worth. GamePlan estimated Marcus's current net worth was about $24.7 million, comprised largely of real estate holdings, and it estimated the net value of her estate at death would exceed $51 million based on a standard asset growth rate of 5 percent and the assumption Marcus would die in 2027 at age 75. Marcus received a copy of GamePlan's written estimate, assumptions, and calculations dated

November 26, 2012.  Marcus's estate planning attorney, Fred Corbalis, calculated the same future value of Marcus's estate.

Uy relied on the GamePlan and Corbalis evaluations and applied a 40 percent effective tax rate to the $51 million future valuation of Marcus's estate, less the $5 million exclusion in effect at the time, to calculate Marcus would need approximately $18 million in life insurance to guarantee the death benefit would cover her estate taxes.  At the time of her deposition in January 2018, Marcus admitted she "really [didn't] know" whether any of the numbers and analyses were inaccurate.

B.  *Marcus Replaces the Jefferson Policies with Southwest Policies in 2012*

The two $2 million Jefferson policies held by Michelle and Branden included an accelerated death benefit (that is, the benefit payable before Marcus's death) of $25,000 for each qualifying event, including specified illnesses, with a $250,000 cap.  In mid-2010, prior to meeting Uy, Marcus considered replacing the Jefferson policies with policies from Pacific Life Insurance Company, but Marc Jacoby, the insurance broker who sold her the Jefferson policies in 2005, dissuaded her from replacing them.  Jacoby explained to Marcus that the Jefferson policies only required premium payments for 10 years from the date of issuance and, therefore, the death benefit would vest in 2015 without any further premium payments.

Sometime in mid-2011, Uy gave a presentation to Marcus and her children in which he proposed replacing the Jefferson policies with policies from Life Insurance Company of the Southwest that he believed would better address Marcus's desire to protect her children from paying her medical expenses.  In

4

contrast to the Jefferson policies, the Southwest policies offered an accelerated death benefit of up to $1 million, with a minimum $500,000 benefit payable if Marcus suffered a terminal illness, chronic illness, or critical illness.[2]

Around September 15, 2011, Jacoby learned upon receiving an insurance replacement form that Marcus intended to replace the Jefferson policies with the Southwest policies sold by Uy. Jacoby spoke with Marcus on multiple occasions, again advising her not to replace the Jefferson policies because they would be fully paid up in 2015, whereas Marcus would have to pay premiums on the new Southwest policies indefinitely. Jacoby asked to see the Southwest policy documents, and at his urging, Marcus delayed switching the policies until Jacoby could meet with both Uy and Marcus in person. At the meeting Jacoby again stressed that replacing the policies would require more premium payments without increasing the $2 million death benefit, and the Jefferson policies had been purchased as a tax-planning investment, not for their ancillary benefits.

Following the meeting with Jacoby and Uy, Marcus nonetheless proceeded to replace the Jefferson polices with the Southwest policies. Michelle signed a replacement notice dated February 17, 2012; Branden signed a replacement notice dated December 1, 2012.

---

[2] The Southwest policies also included an "overloan protection rider," which provided protection for lapses in premium payments, and a provision for the accumulated cash value of the policy to increase over time.

C.  *Marcus Purchases an $8 Million Allianz Policy in June 2013*

Uy recommended Marcus purchase an additional $8 million life insurance policy to meet her goal of paying her estate taxes with her death benefits.  Marcus and Uy discussed the idea for more than two years from their initial meeting, during which period Uy presented Marcus with a variety of options for different levels of coverage and premiums.  Marcus ultimately chose to purchase an $8 million flexible premium adjustable life insurance policy with an index benefit[3] from Allianz Life Insurance Company that required an annual premium of $258,240.  On May 23, 2013 Marcus paid $258,240 as the  first annual premium.  Shortly thereafter, Marcus spoke telephonically with agents at Allianz and told them her estate was worth $25 million and she would be able to pay the sizable annual premiums with cash or by selling assets, rather than financing them.

On June 11, 2013 Uy personally delivered the Allianz policy documents to Marcus at her home.  Uy reviewed the basic terms of the policy with Marcus, offered to answer any questions, and advised Marcus she could back out if she did not want to go through with the enrollment.  Marcus did not have any questions, and she signed the policy documents.  Among the documents,

---

[3]     A flexible premium adjustable life insurance policy with an index benefit is a "a policy where . . . as long as you make payments for the policy, all the cash growing inside the policy can grow based on an index that one chooses on the inside of the policy."  The flexible premium meant Marcus could pay more or less than the planned premium in any policy year (and she could make the payments in a lump sum or monthly) provided the minimum premium payment requirements set forth in the policy were met.

Marcus signed a statement of benefits that illustrated possible benefit scenarios based upon policy and index variables and stated, "I have read this illustration.  It has been explained to me by the agent, and the agent has made no statements that contradict this illustration.  [¶]  I also believe the Allianz Life Pro+ is suitable for my insurance needs."  The first page of the policy document stated Marcus had 30 days in which to cancel the policy without any penalty.  The policy also described the grace periods applicable to untimely premiums and warned that if the policy lapsed, it could only be reinstated once.

The policy documents also included an application questionnaire, signed by Marcus, with boxes checked "yes" in response to the following questions:  "Do you believe this life insurance policy that you are applying for will meet your insurance needs and financial objectives?"; "Did the agent discuss with you your current life insurance policies and other assets prior to your decision to purchase this life insurance policy?"; and "Do you feel you have sufficient liquid assets available for living expenses and emergencies in addition to the money allocated to pay the life insurance policy?"

Marcus admitted in her deposition she would have read these questions when she signed the document and she would not have signed a document that was incorrect.  She also admitted she was capable of understanding the Allianz policy and the benefit illustrations.  Marcus knew she needed to pay minimum premiums to avoid cancellation of the policy and loss of the accumulated cash value, and she knew she could only reinstate the policy one time if it lapsed.

On May 13, 2014 Allianz sent Marcus a notice that her $258,240 annual premium (for the second year of her policy) was

7

due by June 11. Marcus did not make the payment. On July 8 Allianz sent a grace period notice requiring a minimum payment of $86,080 by August 12, 2014 to avoid a lapse in the policy, which amount Marcus remitted on July 27. Marcus continued to miss payments, and Allianz sent her second and third grace period notices requiring additional $86,080 installments. Marcus made the first and second installments, but she missed the April 14, 2015 deadline for the third installment. On April 15 Allianz sent a lapse notice, stating, "Your policy referenced above has lapsed, and there is no coverage in force at this time." On April 28, 2015 Marcus remitted the $86,080, and on May 12 Allianz notified her the policy had been approved for reinstatement.

On May 13, 2015 Allianz sent Marcus a notice that her $258,240 annual premium (for the third year of the policy) was due by June 11, 2015. After Marcus failed to make any premium payment for nearly a year, Allianz on April 8, 2016 sent a grace period notice requiring a payment of $279,760 by May 12, 2016 to avoid a lapse in the policy. In early May 2016, Uy called Marcus and told her to make a payment. She did not, and on May 14 Allianz sent another lapse notice. On May 24 Marcus made a payment of $150,000, but on July 27 Allianz notified Marcus the policy could not be reinstated because the policy had already been reinstated once.[4] On August 3, 2016 Marcus called Allianz to request reinstatement of the policy, without success.

Marcus testified in her deposition she believed all three policies sold by Uy were appropriate for her needs at the time she

---

[4] Allianz deposited Marcus's $150,000 check on June 6, 2016, but on July 28 it sent Marcus a refund check.

purchased them, and she believed the Allianz policy was an appropriate policy for her when she tried to reinstate it in August 2016.[5] As of her deposition in January 2018, Marcus did not know whether the $8 million benefit on the Allianz policy was too high, too low, or just right for her needs.

D.     *Marcus Files This Action in February 2017*

On February 10, 2017 Marcus filed this action against LifePoint, Uy, and Allianz.  On March 23, 2017, she filed a first amended complaint asserting causes of action for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and declaratory relief against LifePoint, Uy, and Allianz.  She also asserted against only LifePoint and Uy causes of action for intentional misrepresentation in the sale of the Southwest and Allianz policies, fraud, negligent misrepresentation, and negligent failure to obtain insurance coverage.  The trial court sustained without leave to amend LifePoint and Uy's demurrer to the causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.  Marcus later settled with Allianz, and Marcus dismissed Allianz with prejudice.

Marcus alleged Uy took advantage of her at a time she was vulnerable due to her litigation with her siblings over her parents' estate; he held himself out as a trusted financial advisor, and "through a series of multiple false representations, convinced [Marcus] to replace the [Jefferson] policies" with the Southwest polices.  Marcus alleged Uy misrepresented that Marcus would

---

[5]     The record does not show a lapse or cancellation of the two $2 million Southwest policies.

9

benefit from replacing the Jefferson policies with the Southwest policies, even though Marcus had almost fully paid for the Jefferson policies, so that Uy and LifePoint would make commissions on Marcus's premiums.[6] Marcus further alleged Uy knew she wanted to have sufficient funds to satisfy her estate obligations but induced her "through a series of misrepresentations and/or omissions" to enter into the Allianz policy with an annual premium of $258,240. Marcus also alleged Uy and LifePoint harmed her by placing her in a flexible premium adjustable life insurance policy with an index benefit, which has a stipulated surrender charge, instead of a simple term life insurance contract. Further, Marcus "never received the subject Allianz policy after paying in excess of [$516,000] in premium[s] and failed to receive the type of coverage she requested."

E.  *LifePoint and Uy's Summary Judgment Motion*
     On May 31, 2018 LifePoint and Uy filed a motion for summary judgment, or in the alternative for summary adjudication, asserting each of Marcus's causes of action was barred by the applicable statute of limitations, the longest of which was three years. LifePoint and Uy argued as to the Southwest policies that before the policies were issued, Uy provided Marcus and her children multiple presentations, illustrations, and documents setting forth the terms, scope of coverage, and benefits. In addition, Marcus knew at the time the policies were issued that the Southwest policies required

---

[6]    On our own motion we augment the record to include the March 23, 2017 first amended complaint. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

continued premiums; unlike the Jefferson policies, a death benefit was not guaranteed after 10 years; and Uy and LifePoint as insurance brokers had a financial interest in the transaction. Moreover, Jacoby expressly cautioned her about the premiums, but she decided to replace the polices.  Accordingly, Marcus was on inquiry notice of her claims at the time she replaced the Jefferson policies in 2011 and 2012, five to six years before she filed the complaint.

With respect to the Allianz policy, LifePoint and Uy argued Marcus understood when the policy was issued in June 2013 and she made her first annual payment (more than three years before she filed her complaint), that the policy required an annual $258,240 premium payment or she would forfeit the death benefit because she would have learned this from her two interviews with the Allianz agents, the illustrations and policy she signed, and the premium statements she received.  Defendants supported their motion with a separate statement, deposition testimony from Marcus, Uy, and Jacoby, and insurance policy documents, correspondence, and payment records.

In her opposition, Marcus argued Uy "misrepresented the nature, extent and scope of the coverage being offered to [Marcus] in both the . . . Southwest policies as well as the Allianz policy and assumed an additional duty, owing to [Marcus] by either express agreement or by 'holding himself out' as having expertise in a given field of insurance being sought by the insured."  She argued she did not learn of Uy's misconduct until August 2016, after the Allianz policy was cancelled, when she first "acquired sufficient information to give rise to the various causes of action." In support of this argument, Marcus relied on her deposition testimony:

11

"Q. Other than your attorney, who have you spoken to about this case? Not just in preparation for your deposition, but who have you spoken to about this case?

"A. Nobody in particular that I know of. I've spoken to another insurance man, which is one of the ways that I found out that some of the stuff was going on.

"Q. Who is this other insurance man?

"A. Patrick Tanzania.

"[Marcus's Counsel]: Tanzillo."[7]

Marcus did not cite in her opposition to any other evidence supporting her contention of delayed notice or submit a declaration stating what she learned from her discussion with Tanzillo that caused her to believe the policies purchased from Uy were unnecessary or that Uy made misrepresentations about the policies. Marcus submitted a responsive separate statement and excerpts of Marcus's and Uy's depositions. In the separate statement, she disputed approximately 30 of the 360 facts offered by LifePoint and Uy, largely based on evidentiary objections, and she included 65 additional material facts supported by excerpts of Marcus's and Uy's depositions.

---

[7] We granted Marcus's motion to augment the record with her opposition memorandum and separate statement. However, the augmented record does not include the evidence Marcus submitted as an attachment to the declaration of her trial attorney, Stanford M. Passman. On our own motion, we augment the record to include the August 3, 2018 Passman declaration and attached documents. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

F.    *The Trial Court's Ruling*

After a hearing, the trial court granted summary judgment in favor of defendants on August 17, 2018.  In its seven-page ruling, the court held Marcus's causes of action were all barred by the statute of limitations and the discovery rule did not apply to defer accrual of the claims.  Citing *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 (*Jolly*), the court explained that under the discovery rule, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing."  The court observed that although Marcus alleged she learned of her injuries in mid-2016, she directed no argument to the discovery rule's objective prong, and a reasonable person would have suspected her alleged harm at the time the policies were issued.

With respect to the Southwest policies, the court concluded, "Any cause of action related to the replacement of the Jefferson Pilot policies was complete with all of its elements when the replacement was performed, over the objection of [Marcus's] regular insurance advisor.  That was done no later than December 1, 2012.  Even if the four-year statute applied to the breach of fiduciary duty claim, [Marcus] should have filed her complaint by December 1, 2016.  The original complaint in this case was filed on February 10, 2017.  Therefore, any claim based on the replacement of the Jefferson Pilot policies is time-barred."  With respect to the Allianz policy, the court similarly concluded, "[Marcus] paid for the Allianz policy in May of 2013; she received and signed the policy on June 11, 2013.  Therefore, any misconduct related to that policy was complete with all its elements by that date.  Under the two-year statute which applies to negligence and the three-year statute which applies to fraud,

13

[Marcus] should have filed her complaint no later than June 11, 2015, or June 11, 2016, respectively. . . . Those claims are therefore time-barred." The court overruled Marcus's evidentiary objections for failing to comply with Rules of Court, rule 3.1354.[8] The court did not rule on defendants' evidentiary objections.

The trial court entered judgment on September 10, 2018. Marcus filed a motion for new trial, which the court denied on October 25, 2018. Marcus timely appealed.

## DISCUSSION

A. *Standard of Review*

Summary judgment is appropriate if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c);[9] *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607 (*Valdez*).) "'"'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'"'" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Valdez*, at p. 607.)

---

[8] Marcus does not argue on appeal the trial court erred in overruling her objections.

[9] All further statutory references are to the Code of Civil Procedure.

14

A defendant may move for summary judgment on the ground there is an affirmative defense to the action. (§ 437c, subds. (o)(2), (p)(2); see *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*) [statute of limitations is an affirmative defense]; see also *Jolly, supra*, 44 Cal.3d at 1109 [trial court properly granted a summary judgment based on statute of limitations].) The defendant has the initial burden to show that undisputed facts supported each element of the affirmative defense. (§ 437c, subd. (p)(2); see *Sumner v. Simpson University* (2018) 27 Cal.App.5th 577, 580 ["As defendants who are moving for summary judgment based on the assertion of an affirmative defense, defendants had the burden to show that undisputed facts supported each element of the affirmative defense."].) Once the defendant meets its burden, the burden shifts to the plaintiff to show there is a triable issue of one or more material facts regarding the defense. (§ 437c, subd. (p)(2); *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484-1485; *Mirzada v. Department of Transportation* (2003) 111 Cal.App.4th 802, 806-807.)

B.     *The Discovery Rule*

"The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues. [Citations.] Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements"—those elements being wrongdoing, harm, and causation.' [Citation.] This is the 'last element' accrual rule: ordinarily, the statute of limitations runs from 'the occurrence of the last element essential to the cause of action.'" (*Aryeh, supra*, 55 Cal.4th at p. 1191; accord, *Howard Jarvis Taxpayers Assn. v. City of La Habra*

(2001) 25 Cal.4th 809, 815; *Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 191 (*Stella*).)

An exception to the general rule of accrual is the discovery rule, "which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo–Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*); accord, *Stella, supra*, 8 Cal.App.5th at pp. 191-192.) "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly, supra*, 44 Cal.3d at p. 1110; accord, *Stella*, at p. 192; see § 338, subd. (d) [cause of action based on fraud or mistake "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake"].)

"A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly, supra*, 44 Cal.3d at p. 1111; accord, *Stella, supra*, 8 Cal.App.5th at p. 192.) "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. . . . [P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Fox*, at pp. 807-808; accord, *Jolly*, at p. 1114 ["the

16

limitations period begins when the plaintiff suspects, or should suspect, that she has been wronged"].)

Courts apply a more relaxed discovery rule to fraud claims against fiduciaries. "Although the general rules relating to pleading and proof of facts excusing a late discovery of fraud remain applicable, it is recognized that in cases involving such a [fiduciary] relationship facts which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required." (*Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 440; accord, *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1394 (*Alfaro*).) Even so, "[a] person in a fiduciary relationship may relax, but not fall asleep. '[I]f she became aware of facts which would make a reasonably prudent person suspicious, she had a duty to investigate further, and she was charged with knowledge of matters which would have been revealed by such an investigation.'" (*Alfaro*, at p. 1394 [even if the defendant community housing developer was in a fiduciary relationship with the plaintiff buyer, disclosure of a deed restriction in grant deeds gave plaintiff actual knowledge of the restriction and the developer's prior nondisclosure of the restriction].)

"The resolution of a statute of limitations defense is typically a factual question for the trier of fact. However, summary judgment is proper if the court can draw only one legitimate inference from uncontradicted evidence about the limitations issue." (*Choi v. Sagemark Consulting* (2017) 18 Cal.App.5th 308, 323-324, 329 [affirming grant of summary judgment in favor of defendants financial advisors based on statute of limitations where evidence showed plaintiffs were on

17

inquiry notice of their causes of action arising from defendants' investment advice]; see *Stella, supra*, 8 Cal.App.5th at p. 193 ["When a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence . . . can support only one reasonable conclusion."].)

C. *The Trial Court Did Not Err in Granting Summary Judgment Because Marcus's Claims Were Barred by the Statutes of Limitations*

1. *The longest limitations period applicable to Marcus's claims is three years*

As the trial court found, and the parties do not dispute, the statute of limitations applicable to Marcus's causes of action alleging fraud is three years (§ 338, subd. (d)), and the statute of limitations applicable to her causes of action alleging negligence is two years (§ 339, subd. (1); accord, *Moss v. Duncan* (2019) 36 Cal.App.5th 569, 574).[10]

As the trial court found, the limitations period applicable to Marcus's cause of action for breach of fiduciary duty is three years. "The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is

_____

[10] We construe Marcus's cause of action for "negligent failure to obtain insurance coverage" as a professional negligence claim subject to section 339, subdivision (1), because the gravamen of Marcus's allegations is that "Defendants . . . owed a duty to [Marcus] to obtain the required insurance policy, and breached said duty by failing to provide to [Marcus] the requested insurance."

fraudulent or nonfraudulent." (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1479; accord, *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 963 ["limitations period is three years . . . for a cause of action for breach of fiduciary duty where the gravamen of the claim is deceit, rather than the catchall four-year limitations period that would otherwise apply"].)  However, where the asserted breach of fiduciary duty effectively "'amount[s] to a claim of professional negligence,'" the two-year statute of limitations for professional negligence applies.  (*American Master Lease LLC*, at p. 1479; accord, *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1159 (*Hydro-Mill*) [where "the complaint shows that the allegations of professional negligence subsume all of the allegations for breach of fiduciary duty," the defendant "cannot prolong the limitations period by invoking a fiduciary theory of liability"].)

Here, Marcus alleged, "Defendants . . . breached their fiduciary duty by the acts and omission set forth above and below including, but not limited to, misrepresentations of fact with the intent to fraudulently induce [Marcus] to enter into the [Allianz policy], which misrepresentations [Marcus] justifiably relied upon to her financial detriment."[11]  The basis of Marcus's breach of

_____

[11]    The first amended complaint also alleged, "Defendants . . . breached the fiduciary duty . . . by failing to comply with the relevant California Insurance Code Sections . . . as stated above." The Insurance Code provisions referenced in the complaint regulate the conduct of licensed insurance agents in substituting policies; accordingly, to the extent Uy's alleged breaches were not fraudulent, the two-year statute of limitations period applicable

fiduciary duty cause of action is that Uy fraudulently induced her to purchase unsuitable and unnecessary insurance to generate commissions. Thus, Uy's alleged breaches of fiduciary duty are in the nature of fraud and subject to the three-year limitations period of section 338, subdivision (d). (See *Fuller v. First Franklin Financial Corp., supra*, 216 Cal.App.4th at p. 963 [three-year limitations period applicable to breach of fiduciary duty claim in homeowner's action against loan broker for predatory lending].)

> 2. *Marcus's claims relating to the Southwest policies are time-barred because they accrued by December 1, 2012*

Marcus contends she did not discover she was injured by Uy's sale of any of the insurance policies until the Allianz policies were cancelled in 2016 and she met with another insurance agent, Tanzillo. Her contention lacks merit. The trial court correctly held Marcus's claims arising from replacement of the Jefferson policies accrued no later than December 1, 2012, when Branden signed the replacement notice for his Southwest policy (Michelle signed her policy on February 17, 2012). Under the applicable two-year or three-year limitations periods, Marcus's complaint filed in February 2017 was untimely.

LifePoint and Uy met their initial burden by presenting evidence showing Jacoby advised Marcus as early as 2010 that replacing the Jefferson policies would be against her financial interest because she only had to pay premiums on the Jefferson policies until 2015 to obtain a vested death benefit. After Uy

---

to professional negligence claims would apply. (See *Hydro-Mill, supra*, 115 Cal.App.4th at p. 1159.)

proposed Marcus replace the Jefferson policies with the Southwest policies, Jacoby repeated his advice not to replace the Jefferson policies, again emphasizing that she would have to continue to pay premiums but would receive the same $2 million death benefit afforded under the Southwest policies. At a 2011 meeting with Uy and Jacoby, Marcus expressed her interest in an accelerated death benefit if she became critically ill, but Jacoby again advised against her replacing the policies.

Marcus failed to meet her burden to present material evidence to raise a triable issue of fact in her opposition. She acknowledged Jacoby advised her not to purchase the policies and Uy did not make any misrepresentations about the benefits available under the Southwest policies. Yet Marcus continued to maintain that Uy's recommendation that Marcus replace the Jefferson policy was bad advice that harmed her financially by requiring her to pay premiums for a longer period of time to obtain an identical death benefit, while enriching Uy with commissions. But this wrongdoing is precisely what Jacoby warned Marcus about in 2011. As he testified, "[L]ike I explained to her, I had nothing to gain by her keeping or getting rid of the [Jefferson] policy. Only that gentleman [had] something to gain by selling this [Southwest] policy."[12] As to Marcus's assertion she first learned Uy had given her bad advice in 2016 when she spoke with Tanzillo, Marcus never presented evidence of what Tanzillo

_____

[12]    Marcus's own separate statement of additional undisputed material facts includes the assertion, "At the conclusion of their meeting . . . , Jacoby formed the conclusion that the [Southwest] policies Defendant Uy was trying to sell to [Marcus], w[ere] not in the best interest of Marlene Marcus and w[ere] totally inappropriate."

21

told her that was different from what Jacoby told her in 2010 and 2011 (or that it had anything to do with the Southwest policies). As a result, Marcus did not meet her burden to show delayed discovery, and her claims accrued when the last element of her causes of action occurred—when her children signed for the Southwest policies in 2012. (*Aryeh, supra*, 55 Cal.4th at p. 1191.)

3. *Marcus did not raise a triable issue of material fact that her later realization the Allianz policy was unsuitable deferred accrual of her claims*

Marcus's contention that her claims related to the Allianz policy only accrued when the policy was cancelled in 2016 and she met with Tanzillo likewise lacks merit. As the trial court correctly held, Marcus's claims related to the Allianz policy accrued by June 11, 2013, when she signed the policy, because "any misconduct related to that policy was complete with all its elements by that date." Because the longest limitations period applicable to Marcus's claims is three years, her claims were untimely.

LifePoint and Uy met their initial burden by presenting evidence Marcus was on actual or constructive notice of the suitability of the Allianz policy that forms the basis of Marcus's claims. Marcus expressed to Uy the desire to purchase sufficient insurance so the death benefit would cover her estate taxes without drawing from the estate to avoid the troubles she faced in addressing her parents' estate. Uy's recommendation Marcus purchase an additional $8 million in death benefits to achieve this goal was based on independent evaluations of Marcus's projected estate value conducted by GamePlan and Marcus's estate attorney, Corbalis. Marcus and Uy discussed policy

options for nearly two years before Marcus selected the Allianz policy. Marcus told the Allianz agents her estate was worth $25 million and she could afford the $258,000 annual premium payments. When Uy delivered the Allianz policy documents to Marcus, he went over them with her and offered to answer any questions. Without asking questions, Marcus signed the documents, including a disclaimer that she read the policy's illustration of the adjustable premium and index benefit, the agent explained the policy to her consistent with the illustration, and she believed the policy met her needs. In the signed application, Marcus indicated she agreed the Allianz policy would meet her "insurance needs and financial objectives" and she had sufficient liquid assets for her living expenses and emergencies beyond the funds needed for the policy premiums. Marcus also admitted she understood she was obligated to pay the premiums and a defaulted policy could only be reinstated once. Marcus graduated from law school and admitted she was capable of reading the Allianz policy and the benefit illustrations.

Marcus failed to meet her burden to create a triable issue of fact that there was any aspect of the Allianz policy that she discovered after purchasing the policy. Although Marcus points to facts she learned from her meeting with Tanzillo, the only evidence she submitted with respect to the meeting is the brief excerpt of Marcus's deposition in which she stated when asked with whom she had discussed the case other than her attorney, "I've spoken to another insurance man [Patrick Tanzillo], which is one of the ways that I found out that some of the stuff was going on." But Marcus did not identify what she learned from Tanzillo. Nor did she present any evidence that the valuation of her estate Uy relied on in recommending she obtain $8 million of

23

additional insurance was in error.  Therefore, Marcus failed to rebut the showing she had actual or constructive knowledge of the policy's unsuitability after having conversations with Uy and Allianz and reading and signing the policy and its disclaimer, or that she should be excused of her obligation to undertake a reasonable inquiry.  (See *Jolly, supra*, 44 Cal.3d at p. 1114; *Stella, supra*, 8 Cal.App.5th at p. 192 [where the purchase price of properties set forth in a private placement memorandum exceeded the properties' prices, a reasonable person would have inquired into whether seller was collecting a commission].)  Even if we were to apply the relaxed discovery rule based on Marcus's contention Uy acted as her fiduciary in holding himself out as a wealth manager and cultivating her trust, Marcus did not present evidence to suggest her claim is based on anything other than what she learned from her meetings with Uy and the Allianz agent and her review of the policies.  (*Alfaro, supra*, 171 Cal.App.4th at 1394.)

## DISPOSITION

The judgment is affirmed.  Defendants are to recover their costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.                    SEGAL, J.

24